824 So.2d 456 (2002)
Gary TATE
v.
CABOT CORPORATION.
No. 01-1652.
Court of Appeal of Louisiana, Third Circuit.
July 3, 2002.
*458 Gary J. Ortego, Ville Platte, LA, for Plaintiff-Appellant, Gary Tate.
Charles J. Foret, Crystal D. Burkhalter, Lafayette, LA, for Defendant-Appellee, Cabot Corporation.
Court composed of NED E. DOUCET, JR., C.J., ULYSSES GENE THIBODEAUX and SYLVIA R. COOKS, Judges.
THIBODEAUX, Judge.
This is an appeal from the Office of Workers' Compensation. Over the course of Gary Tate's employment with defendant, Cabot Corporation, he sustained work related injuries more than once. On August 18, 1999, Mr. Tate, plaintiff, was working alone as janitor, filling a mop bucket in a sink. Upon lifting the bucket from the sink to place it on the floor, he experienced a burning pain in his neck and shoulder. The accident was unwitnessed. Cabot Corporation denied Mr. Tate's *459 workers' compensation claim and has paid neither weekly compensation benefits nor medical expenses. The defendant employer argues lack of corroboration of the unwitnessed accident, and that Mr. Tate's present injuries are neither new, nor do they result from an aggravation of his preexisting injuries. The workers' compensation judge denied the claim and found that Mr. Tate failed to prove by preponderance of the evidence that an accident occurred in the course and scope of his employment. We reverse in part, affirm in part, and remand. We conclude that Mr. Tate proved the occurrence of an accident within the course and scope of his employment, but the employer reasonably controverted his claims. We remand for a determination of indemnity benefits.

I.

ISSUES
We shall consider whether the workers' compensation judge erred:
1) in finding that Mr. Tate failed to meet his burden of proof that an unwitnessed August 18, 1999 accident occurred in the course and scope of his employment; and
2) in failing to award statutory penalties and reasonable attorney fees to Mr. Tate for Cabot Corporation's failure to pay weekly compensation benefits and prescribed medical treatment following the August 18, 1999 accident.

II.

FACTS AND PROCEDURAL HISTORY
Gary Tate was an employee of Cabot Corporation (hereinafter "Cabot") for 27 years, first in maintenance and repair, and then in a janitorial capacity. In January 1984, Mr. Tate and some co-workers were repairing a roof which collapsed, causing injury to his neck, shoulder, and hip. He was treated by Dr. Thomas Soileau, general practitioner; Dr. Thomas Fontenot, family physician; and Dr. Thomas Butaud, orthopedist. Mr. Tate eventually returned to his job, first to light duty, then back to full duty. He testified that he continued to experience neck and shoulder pain. Cabot was aware of his injuries and the parties stipulated to the 1984 accident at the hearing.
Some ten years later, Mr. Tate struck his head on a pipe, causing recurrent neck and shoulder pain. He visited his family physician, but no workers' compensation benefits were collected on this injury. The symptoms from the 1984 injury persisted. In 1997 and 1998, Mr. Tate visited Dr. Mark Dodson and Dr. Butaud for continued neck and shoulder pain. Both doctors recommended lighter duty, and in January 1999, Mr. Tate assumed a janitorial position.
As a janitor, Mr. Tate testified that he continued to experience pain. This testimony was corroborated by his supervisor, Mr. Terrell Fontenot. Dr. Fontenot, whom Mr. Tate had seen following the 1984 accident, referred him to Dr. William Foster. On August 3, 1999, he visited Dr. Foster, complaining of neck pain, right arm and shoulder pain, left shoulder pain, difficulty abducting his left shoulder, a locking of the left shoulder, and an element of discomfort in his left upper extremity.
According to an e-mail memorandum written by Cabot official Mr. Bruce Reighard, he and Mr. Tate had a discussion on the morning of August 16, 1999 regarding Mr. Tate's visit with Dr. Foster. If shoulder surgery proved necessary, Mr. Tate evidently asked Mr. Reighard to support a claim that the injury was work related. Mr. Reighard responded that he could not make that type of promise, and that each *460 situation was evaluated on a case-by-case basis. In another e-mail memorandum, former Human Resources Manager Mr. Ken Hebert detailed a conversation with Mr. Tate prior to the August 18 incident. Following his visit with Dr. Foster, Mr. Tate evidently expressed his belief to Mr. Hebert that his physical problems stemmed from the 1984 accident and that Cabot "owed him this."
At approximately 5:15 a.m. on August 18, 1999, Mr. Tate was working alone, filling a mop bucket in a sink. When he lifted the filled bucket from the sink to place it on the floor, he testified to a burning pain in his neck and shoulder, causing him to drop the bucket and fall to his knees. The alleged event was unwitnessed. Mr. Tate immediately reported the incident to his supervisor, Mr. Fontenot, who then reported it to Cabot's safety supervisor, Mr. Chris Brown. Mr. Brown completed an "Employer's Report of Occupational Injury or Disease" and escorted Mr. Tate to Dr. Steven Vidrine.
Mr. Tate saw Dr. Foster as well, who, in a report dated September 1999, noted his opinion that the August 18 incident had aggravated his patient's preexisting injuries. He also noted that there had been no other change in Mr. Tate's symptomatology other than an increase in the severity of pain. Dr. Foster did not think Mr. Tate should continue working and recommended cervical surgery, which was eventually performed in March 2000. On February 4, 2000, Dr. Foster reported that Mr. Tate's condition appeared to result from an aggravation of his preexisting injuries, and on July 18, 2000, Dr. Foster again linked his patient's condition to his work-related injury. At the time of the hearing, Mr. Tate was still under the care of Dr. Foster, and was seeing Dr. Lynn Foret for injuries to his shoulder.
When Cabot denied Mr. Tate's workers' compensation claim, Mr. Tate financed his medical treatment personally, and through his private medical plan. Since the incident, Cabot has paid neither medical expenses nor weekly compensation benefits. Mr. Clarence Butler, Director of Human Resources at Cabot, testified that he denied his claim based in part upon Mr. Reighard and Mr. Hebert's e-mail memoranda. The judgment denied the claim, and declared Mr. Tate's failure to prove by preponderance of the evidence that an accident occurred in the course and scope of his employment.

III.

LAW AND DISCUSSION

Unwitnessed Accident with Preexisting Injury
A workers' compensation claimant must establish "personal injury by accident arising out of and in the course of his employment." La.R.S. 23:1031(A). Mr. Tate argues that new injuries or an aggravation of previous injuries resulted from an accident on August 18, 1999. This litigation does not center around the compensability of any incident prior to August 1999. The evidence of Mr. Tate's previous work-related injuries was only offered to show a potential source of initial injury which was allegedly aggravated by the August 1999 incident. For purposes of the Workers' Compensation Act, an "accident" is "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La.R.S. 23:1021(1) (emphasis added).
There is no question as to Mr. Tate's medical problems before August 18, 1999. Prior to the incident, his medical records *461 reveal that Dr. Butaud suggested neck surgery, Dr. Soileau noted neck and shoulder pain as a result of the 1984 accident, and Dr. Craig Robin, a chiropractor, noted similar aches and pains. Indeed, days before the accident, on August 3, he visited Dr. Foster. Mr. Tate explained that he was having trouble mopping, and his complaints to Dr. Foster were of neck pain, right arm and shoulder pain, left shoulder pain, difficulty abducting his left shoulder, a locking of the left shoulder, and an element of discomfort in his left upper extremity. Dr. Foster's impression was these were "job related problem[s] that [have] been progressive even though the patient has continued to work over the past 15-½ years" since 1984. Mr. Tate took time off of work after his August 3 visit with Dr. Foster. At the time of his Open Air MRI on August 7, Mr. Tate reported neck and shoulder pain as well as numbness in his hands and fingers.
Because an employer takes his employee as he finds him, a preexisting condition does not prevent recovery through workers' compensation. Curtis v. Wet Solutions, Inc., 98-789 (La.App. 3 Cir. 12/9/98); 722 So.2d 421. Aggravation of a preexisting injury may constitute a disabling injury when, for example, the plaintiff begins to suffer new symptoms after the second workplace accident. Howell v. Service Merchandise Co., Inc., 95-79 (La.App. 3 Cir. 8/9/95); 663 So.2d 96. To be compensable, the aggravation of a preexisting injury must result from an identifiable and discernable incident. City of Eunice v. Credeur, 99-302 (La.App. 3 Cir. 10/13/99); 746 So.2d 146, writ granted in part, judgment vacated in part, 99-3249 (La.1/28/00); 753 So.2d 226. Moreover, there must be a causal link between the aggravation and a work related incident. As we have recently explained,
[a] pre-existing disease or infirmity does not disqualify the claimant from receiving benefits if the workplace accident aggravated, accelerated, or combined with the disease to produce the disability for which compensation is claimed. Thus, the element of causation is satisfied if the employee's work-related accident was a factor in bringing about the employee's disabled status. Whether a causal relationship exists between the disability and the employment is a question of fact. The hearing officer's determination in this regard cannot be reversed unless it is manifestly erroneous based on examination of the record as a whole.
The employee's workplace accident is presumed to have caused or aggravated her disability when she proves that: (1) before the accident, she had not manifested disabling symptoms; (2) commencing with the accident, the disabling symptoms appeared; and (3) there is medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and activation of the disabling condition. Once an employee establishes the presumption of a casual relationship, the employer must produce evidence and persuade the trier of fact that it is more probable than not that the injury was not caused by the work accident.
Rideaux v. Franklin Nursing Home, 95-240, p. 5 (La.App. 3 Cir. 11/22/95); 664 So.2d 750, 755, writ denied, 95-3093 (La.2/16/96); 667 So.2d 1058 (citations omitted). In Rideaux, we went on to explain that "[t]he presumption of causation may attach to a claimant who exhibited symptoms of her allegedly disabling illness in the distant past provided that she had suffered no such symptoms immediately prior to her workplace accident." Id. at 756. The claimant in Rideaux was asymptomatic prior to her accident, and her disability *462 manifested itself only after her fall. Finding no error with the hearing officer's conclusion that the employer failed to rebut the presumption of causation, we simply said that though the claimant was able to perform her job prior to her fall, she was rendered unable to do so subsequent thereto. As such, she was entitled to the presumption of causation.
In support of its position, Cabot highlights Dr. Foster's August 3 impression, that Mr. Tate's medical problems were "progressive." And while progressive degeneration does fall outside of the definition of "accident," we note that this impression was made prior to the August 18 accident in question. Whether or not Mr. Tate's condition prior to August 18 was progressive is of no moment if new elements of injury arose from a subsequent identifiable and discernable event. August 18 was subsequent to August 3, and Cabot's argument that Dr. Foster's August 3 impression defeats this claim improperly presupposes that progressive conditions cannot be exacerbated by intervening injuries.
Cabot also points to Mr. Tate's deposition testimony, when he stated that prior to August 18, he had no numbness in his fingers or arms. At the hearing, however, he stated that he had had numbness prior to the accident. That notwithstanding, we note that at that same hearing, Mr. Tate was asked about the August 18 incident, "was it new painwas it new areas or it's the same areas you had problems with?" Mr. Tate responded that "the pain coming in my neck and my shoulder waswas burning. That was new." On the day of the accident, Dr. Vidrine examined Mr. Tate. He noted that "while [Mr. Tate] was lifting [the bucket,] he felt a sudden popping in the right side of his mid neck that caused shooting pain to radiate down the arm." Mr. Tate described the pain as "pretty severe especially when he moves his head a certain [way] which seems to make it worse." Subsequent medical records support Dr. Vidrine's notes and Mr. Tate's testimony, and significantly outweigh the conflict between Mr. Tate's deposition and trial testimony.
Less than one month after the August 18 accident, Dr. Foster noted that "[s]ince I last saw him [on August 3], he has had an intervening problem. The patient was picking up a large bucket of water out of a sink. He was working when he developed a severe burning pain in his neck causing him to drop this bucket, and increased the degree of neck and right arm pain that he had already complained with." (Emphasis added). He went on to add that Mr. Tate "has not return [sic] to work since this second injury, 8/18/90" and that "this would appear to be aggravation of a preexisting problem. There has been no other change in his symptomatology other than an increase in the severity of his pain." (Emphasis added). His impression on that day was "[c]ervical disk with radiculopathy aggravated by his most recent accident, bilateral carpal tunnel syndrome." (Emphasis added).
Dr. Foster noted the aggravation of a preexisting injury again after his visit with Mr. Tate on February 4, 2000. And again, on July 18, 2000, Dr. Foster noted Mr. Tate's torn rotator cuff and reported that it "appears it is related to his on-the-job injury." (Emphasis added). On May 30, 2001, Dr. Foret noted that "[r]einjury also occurred with shoulder pain in 1999, while picking up a large container of water out of a sink and [he] injured himself at that time with neck pain and immediate shoulder pain." (Emphasis added).
Clearly, Mr. Tate was not completely healed from his preexisting injuries. His pre-accident state of health, though less than perfect, will not preclude him from *463 claiming workers' compensation in this case. The removal of the mop bucket from the sink was an unexpected, identifiable, and discernable incident. While Mr. Tate may have manifested symptoms prior to the accident, they were neither immediate nor disabling; he worked for many years with preexisting medical problems. After lifting the bucket, Mr. Tate began to experience elements of pain, and Dr. Foster noted that while there was no new symptomology, there was an objective increase in the severity and degree of pain. Moreover, a significant number of references in the medical notations clearly indicate that the accident aggravated, accelerated, or combined with his preexisting infirmities. This creates a reasonable possibility of a causal connection between the accident and his present condition.
Since Cabot has not presented satisfactory evidence contrary to our opinion that Mr. Tate's most recent accident was a factor in creating his present disability, the element of causation is satisfied. Simply put, though Mr. Tate was not asymptomatic prior to the accident, he was able to perform his job prior to August 18, and unable to do so afterward. As we have said in the past, "[i]t is well settled in Louisiana that an `accident' exists when heavy lifting or other strenuous efforts, although usual and customary, cause or contribute to a physical breakdown or accelerate its occurrence because of a preexisting condition." Robinson v. Travelers Ins. Co., 619 So.2d 1261, 1264 (La.App. 3 Cir.1993). Based upon the examination of the record as a whole, we find no merit to Cabot's argument that Mr. Tate did not suffer a new injury on August 18 or that his preexisting injuries defeat his present claim.
Having determined that Mr. Tate suffered new injuries on August 18, or that his preexisting injuries were aggravated on that day, we now turn to the issue of the accident being unwitnessed. Proof of an accident must be by preponderance of the evidence, and a claimant's testimony alone may be sufficient to discharge this burden, provided two elements are satisfied. First, no other evidence must discredit or cast serious doubt upon the claimant's version of the incident, and second, his testimony must be corroborated by circumstances following the alleged incident. Bruno v. Harbert Intern. Inc., 593 So.2d 357 (La.1992); Honeycutt v. Elbert Walker Construction, 01-1291 (La.App. 3 Cir. 2/6/02); 815 So.2d 1011. Corroboration of the claimant's testimony may be provided by the testimony of co-workers, spouses, friends, or by medical evidence. Bruno, 593 So.2d 357. Barring circumstances that cast suspicion on the reliability of the claimant's uncontradicted testimony, the trial court should accept the testimony as true when determining whether he has discharged his burden. Id.; Honeycutt, 815 So.2d 1011. These determinations are factual in nature and will not be disturbed unless clearly wrong or manifestly erroneous. Id.
Cabot points to the fact that shortly before the accident, Mr. Wilson Thomas was "bumping" Mr. Tate from the janitorial position since Mr. Thomas had greater seniority. Mr. Tate spoke with Mr. Hebert about securing a new position. It was during this conversation that Mr. Tate, having just seen Dr. Foster, evidently expressed his belief to Mr. Hebert that his physical problems stemmed from the 1984 accident and that Cabot "owed him" for these problems. Mr. Hebert recounted this conversation in an e-mail memorandum. Mr. Reighard explained in another e-mail memorandum that two days before the accident, he and Mr. Tate discussed Mr. Tate's visit with Dr. Foster. If shoulder *464 surgery proved necessary, Mr. Tate evidently asked Mr. Reighard to support a claim that the injury was work related.
Mr. Butler denied knowledge of documentation or witnesses that disproved Mr. Tate's account of the August 18, 1999 incident. Mr. Hebert also denied such knowledge. Supervisor Mr. Fontenot testified that he had no information to suggest that the incident occurred in any manner other than that described to him by Mr. Tate. Considering this, evidence of the conversations with Mr. Hebert and Mr. Reighard are simply not sufficient enough to discredit or cast serious doubt upon Mr. Tate's version of the incident.
Mr. Tate's accident was unwitnessed, which is conceivable, considering that the janitors arrived at 5:00 a.m., earlier than other employees. Mr. Fontenot not only corroborated this fact, but testified further that when he arrived at work, Mr. Tate explained to him that he had just injured himself removing the bucket of water from the sink. Mr. Fontenot then conveyed the situation to the safety supervisor, Mr. Brown, who documented the accident. Cabot argues that since Mr. Fontenot testified that the accident occurred on Mr. Tate's first day back after time off from work, his testimony is not corroborative. Cabot's argument erroneously assumes that because August 18 was Mr. Tate's first day back, he was somehow insusceptible to injury.
Mr. Fontenot's testimony, along with that of co-workers Mr. Carol Prudhomme and Mr. Thomas, corroborated Mr. Tate's testimony that because there were no other faucets or spigots available, Mr. Tate was justified in filling the bucket in the sink. His method was completely acceptable, as there were no written procedures on proper filling. Though Mr. Prudhomme testified that he had found an alternate method to fill the bucket, both he and Mr. Thomas testified that there was no mandated method to accomplish the task. Mr. Prudhomme had had trouble in the past lifting the bucket from the sink, and Mr. Thomas testified that he had complained to Mr. Fontenot about the difficulty in removing the bucket from the sink.
The medical evidence cited above in connection with the aggravation of Mr. Tate's preexisting injuries is more than sufficient to corroborate his testimony. Since no testimony was offered by any of his treating physicians, we have no choice but to rely on their notations in the charts. Any conflict in medical evidencesuch as that between Mr. Tate's deposition testimony that he had no numbness in his fingers or arms prior to August 18 and his hearing testimony that he did have numbness prior to the accidenthas to do with the extent of disability, not with whether or not the accident occurred. In any event, such a conflict does not serve to make the whole of the medical evidence any less corroborative. Such evidence, therefore, when combined with the testimony of his co-workers, bolsters the reliability of Mr. Tate's version of events. The hearing officer's determination that he failed to prove an accident by preponderance of the evidence is, therefore, manifestly erroneous.

Penalties and Attorney Fees
At the hearing, Cabot stipulated that it is self-insured for workers' compensation insurance and that it had paid neither workers' compensation benefits nor medical expenses since the date of the accident. "An employee is entitled to penalties and attorney fees for the employer's failure to timely pay benefits unless the employee's rights to benefits were reasonably *465 controverted[1] by the employer or his insurer or the nonpayment resulted from conditions over which the employer or insurer had no control." Kibodeaux v. Cajun Bag and Supply Co., 99-149, p. 4 (La.App. 3 Cir. 6/2/99); 742 So.2d 582, 584; La.R.S. 23:1201. See also Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98); 721 So.2d 885. If the employer had some valid reason or evidence upon which to base its denial of benefits, then it has reasonably controverted the claim, thereby avoiding the imposition of penalties and attorney's fees. Id. To determine whether Mr. Tate's claim has been reasonably controverted, we "must ascertain whether the employer or his insurer engaged in a non-frivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed." Id. at 890.
According to Mr. Hebert's account of a conversation with Mr. Tate days before the accident, Mr. Tate evidently expressed his belief that his physical problems stemmed from the 1984 accident and that Cabot "owed him this." He was upset at the prospect of being "bumped" out of the janitorial position by Mr. Thomas. Moreover, Mr. Butler testified that he reviewed the August 24, 1999 e-mail memorandum from Mr. Reighard, detailing a conversation two days before the accident, when Mr. Tate evidently asked Mr. Reighard to support a claim that cause for potential shoulder surgery was work related. Mr. Butler testified that this e-mail was a factor in his decision to deny workers' compensation benefits. Mr. Butler also acknowledged that the records of Cabot contained Dr. Foster's pre-accident impression that Mr. Tate's injuries were "progressive," thereby precluding the application of the definition of "accident."
In the end, this evidence was insufficient to counter Mr. Tate's proof of entitlement to benefits and medical expenses. However, we concede that even with possession of updated medical records, it was reasonable for Cabot to determine that Mr. Tate's post-accident injuries were neither new nor aggravations of preexisting injuries. We believe that the available medical information, along with Cabot personnel's exposure to Mr. Tate's comments prior to the unwitnessed accident, reasonably countered the factual and medical information presented by Mr. Tate. After thorough review of the record, therefore, we are satisfied that though Cabot's evidence is somewhat tenuous, it has reasonably controverted Mr. Tate's claim. Therefore, neither penalties nor attorney fees are warranted.
At the hearing, Cabot stipulated that the total amount of prescribed medical treatment and bills was $32,124.75. No sum of this amount has been paid. Because we find that Mr. Tate has proven an accident in the course and scope of his employment, the full stipulated amount is hereby due to him.
Pursuant to La.R.S. 23:1021(10)(a)(i), "[i]f the employee is paid on an hourly basis and the employee is employed for forty hours or more, [then his average weekly wage is] his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater." At the hearing, the parties stipulated *466 that Mr. Tate's last day of work was August 18, 1999, and that he was earning $21.16 per hour, working 40 hours per week. And though the record reveals that Mr. Tate took time off from work immediately prior to the accident, it does not contain payroll records. As such, we are unable to determine whether or not the average actual hours worked in the four weeks preceding the accident were greater than forty hours. We remand to the Office of Workers' Compensation for the proper calculation of Mr. Tate's average weekly wage as well as his concomitant indemnity benefits.

IV.

CONCLUSION
Considering the foregoing, the judgment appealed from is reversed insofar as it denied the claim for failure to prove by preponderance of the evidence that an accident occurred in the course and scope of employment, affirmed insofar as it denied statutory penalties and attorney fees, and remanded for calculation of claimant's average weekly wage and concomitant indemnity benefits.
REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.
NOTES
[1] Because Mr. Tate prays for statutory penalties and attorney fees for Cabot's failure to pay benefits, and not for Cabot's discontinuance of benefits, the "arbitrary, capricious, or without probable cause" standard for attorney's fees under La.R.S. 23:1201.2 is inapplicable. See Brown, 721 So.2d 885.