FREDERICKA HOMBERG WICKER, Judge.
12The plaintiff/appellant appeals the trial court’s judgment which dismissed her workers’ compensation claim. For the reasons that follow, the judgment appealed from is affirmed.
Factual and Procedural Background
The plaintiff/appellant, Mrs. Sherri Ho-tard, filed a Disputed Claim for Compensation (1008 compensation claim) on October 31, 2007 due to a workplace injury that occurred while she was under the employ of the defendant/appellee, Murphy, Rogers, Sloss, and Gamble (Murphy Rogers). The 1008 compensation claim form contends that Mrs. Hotard fell on her left side and injured her neck and shoulder when she tripped over a telephone cord on October 27, 2006. Murphy Rogers excepted to the petition on January 24, 2008, alleging prematurity pursuant to La. R.S. 23:1314. Mrs. Hotard responded to the exception on June 13, 2008, by amending the 1008 compensation claim on June 13, 2008, alleging that CNA — Murphy Rogers’ insurer— failed to reimburse her out-of-pocket expenses and has repeatedly denied reasonable medical treatment. Murphy Rogers subsequently |sfiled a motion to reclassify benefits from temporary total disability benefits (TTD) to supplemental earnings benefits (SEBs) on the ground that a doctor had never deemed Mrs. Hotard unable to work. The trial court denied that motion on October 14, 2009, and the case proceeded to trial on July 12, 2010.

Testimony

Drs. John Lee Moss, Joseph Crapanza-no, Andrew Todd, Todd Finney, Gordon Nutik, Bradley Bartholomew, and Robert Applebaum were some of the doctors who were deposed in preparation for trial.
Dr. John Lee Moss, a general orthopedic surgeon at Southern Orthopedic Specialists, Inc. (Southern Orthopedic), testified about Mrs. Hotard’s treatment at the clinic.
He stated that Mrs. Hotard first began treating at Southern Orthopedic in 1999 when she presented with bursitis in the right elbow and forearm. She was then seen in 2003 for problems associated with her right shoulder and arm, as well as for arthritis. Dr. Moss explained that Mrs. Hotard was injured in a car accident on June 18, 2004, and returned to Southern Orthopedic with neck and back pain, which she described as a burning sensation that radiated down her left arm. The 2004 MRI revealed degenerative bulging discs. Dr. Moss stated that Mrs. Hotard’s last visit, prior to the time he began treating her, occurred on May 25, 2005, and was a follow-up examination of her neck and back.
Dr. Moss first examined Mrs. Hotard on October 24, 2006. At that time, she informed him that she had recently been doing a lot of house and yard work and was having increasing pain in her neck, left shoulder, and upper extremity, as well as left arm numbness. Dr. Moss noted that the symptoms Mrs. Hotard presented *409 with on October 24, 2006, were similar to the symptoms she experienced after the 2004 car accident. He stated that the physical examination he performed on | ^October 24th revealed an absent triceps reflex on the left. He opined that such a finding was indicative that something was going on at the C6-C7 level in the neck but that it could also be indicative of an injury directly below the elbow. He further opined that Mrs. Hotard had a preexisting degenerative condition in her cervical spine on October 24, 2006.
Dr. Moss stated that Mrs. Hotard returned to his office on October 30, 2006, indicating that she had suffered a workplace fall on October 27, 2006. The only change he noted from her October 24th examination, six days earlier, was that she had a more limited range of motion in her neck. Besides that, the only changes were her subjective complaints of pain in the left shoulder, left elbow, and left hand. Dr. Moss opined that Mrs. Hotard’s workplace accident aggravated her preexisting degenerative condition.
Dr. Joseph Crapanzano, an expert in pain management, stated that he first saw Mrs. Hotard on December 4, 2006, when she presented with left neck, arm, and shoulder pain. He administered an epidural steroid injection (ESI) two days later on December 6, 2006, and gave her a second injection on January 3, 2007 when she indicated that her pain returned. On January 23, 2007, Mrs. Hotard returned to his office and explained that she had near complete relief in her left arm, adding that her pain level had decreased from an 8 out of 10 to a 5/6 out of 10. When she returned on March 1, 2007, Dr. Crapanzano stated that he withheld the ESI because Mrs. Hotard stated that her shoulder had improved. He stated, however, that her symptoms later returned, and he administered a third ESI on June 27, 2007.
Dr. Crapanzano noted that he did not see Mrs. Hotard again until November 10, 2009, when she presented with left arm weakness, rating her pain as 10 out of 10. He noted that she had diminished range of motion in her cervical spine and Isdecreased sensation in the deltoid region of her left arm. He, therefore, recommended another ESI, which she received on January 4, 2010. Ten days after the injection, Mrs. Hotard returned to his office stating that she had not gotten any relief. Finally, Dr. Crapanzano opined that Mrs. Hotard could return to light duty work, with the proviso that she would likely not work well.
Dr. Andrew Todd, a spine surgeon at Southern Orthopedic, testified that Mrs. Hotard presented to him with complaints of left arm and neck pain as well as pain in the upper thoracic spine. He diagnosed her with degenerative disc disease and/or disc herniation at multiple levels on the neck. Initially, he felt that Mrs. Hotard was a good candidate for interior cervical discectomy and fusion. He later changed his opinion because other diagnostic testing revealed that she did not have severe stenosis and because her complaints became less about her arm and more about her neck. Dr. Moss stated that Mrs. Ho-tard complained of overhead activities and more localized pain in her shoulder on January 22, 2008, and an examination showed signs of either impingement or rotator cuff tendonitis in the shoulder, which he treated with steroid injections. He further stated that Mrs. Hotard returned on July 30, 2008, indicating that the pain had returned. At that point, he opined that she might be suffering from rotator cuff tendinitis, so he administered another steroid injection. When she returned on September 11, 2008, however, with significant shoulder pain, Dr. Todd stated that he referred her to Dr. Todd *410 Finney. Finally, Dr. Todd stated that he would release Mrs. Hotard to work within the limitations noted in the functional capacity evaluation (FCE).
Dr. Todd Finney, an orthopedist at Southern Orthopedic, testified that he first treated Mrs. Hotard on September 29, 2008, upon Dr. Todd’s referral. He noted, however, that Mrs. Hotard denied having any pre-existing shoulder problems. Dr. Finney stated that Mrs. Hotard’s MRI showed pathology in the |,¡rotator cuff. He opined that the labral tear was associated with her 2006 workplace fall but opined that the rotator cuff was more chronic. He performed an arthroscopy on October 9, 2008, and noted that Mrs. Hotard had completed physical therapy by November 21, 2008. Dr. Finney stated that once he received the FCE on January 23, 2009, he felt that Mrs. Hotard could return to work by February 23, 2009 and would have reached maximum medical improvement, for her shoulder, by that date as well. He stated that Mrs. Hotard, however, had concerns about returning to work on that date. Due to her concerns, Dr. Finney stated that he might have said that he would keep her out of work until he obtained another FCE. He stated, however, that he does not recall specifically revoking the return-to-work letter.
Dr. Gordon Nutik examined Mrs. Ho-tard on March 10, 2009. His examination revealed that she had limited range of motion in her neck. He also performed a Tinel and Phalen’s test, both of which were negative. He noted that “per the patient and the exam, the left elbow and wrist complaints had resolved.” Dr. Nutik stated that he reviewed the 2004 MRI with the MRI from the workplace accident and noted progression at the C5-6 and C6-7 levels. He opined that the progression was more likely a progressive degenerative change rather than a result of her workplace fall. He added that Mrs. Hotard’s symptoms were likely preexisting considering that she reported the same symptoms a few days before her fall. Finally, Dr. Nutik opined that Mrs. Hotard could have returned to sedentary work at the time he examined her.
Dr. Bradley Bartholomew examined Mrs. Hotard once on April 8, 2010. His physical examination revealed carpal tunnel syndrome in her left hand. He, therefore, recommended a carpal tunnel release, which he opined could possibly alleviate her neck pain. Dr. Bartholomew stated that he may have mentioned a |7cervical fusion as a possibility after the carpal tunnel release but denied actually recommending the procedure. He opined that Mrs. Hotard’s hand condition was related to her workplace fall, adding that her neck and arm symptoms were an aggravation of a preexisting condition. Although Dr. Bartholomew stated that Mrs. Hotard’s workplace fall could have either caused or aggravated a preexisting carpal tunnel syndrome, he stated the he did not see any evidence of preexisting carpal tunnel syndrome in her medical records. He opined, however, that if she previously had carpal tunnel syndrome, the fall likely aggravated it. Finally, Dr. Bartholomew opined that Mrs. Hotard could not return to work within the parameters set forth in the FCE.
Dr. Robert Applebaum, a neurosurgeon, examined Mrs. Hotard on May 6, 2010. He stated that Mrs. Hotard did not report falling on her left wrist, adding that his examination did not reveal carpal tunnel syndrome. He noted, however, that her medical records revealed a history of prior left wrist injury. He performed a physical examination that revealed rigidity in her neck. He related that finding to her degenerative disc disease of the cervical spine, which he opined may have been *411 temporarily aggravated by her workplace fall. Dr. Applebaum further opined that Mrs. Hotard’s symptoms were the natural progression of her underlying cervical spondylosis, adding that she had reached maximum medical improvement by the time he examined her. Finally, he opined that Mrs. Hotard could have returned to work within three to six months after her workplace fall based on the job description provided by Murphy Rogers.
Ms. Debbie Lociero, the office manager at Murphy Rogers, testified at the trial. She stated that Mrs. Hotard was a valued employee, adding that they made every effort to accommodate her. She explained that Mrs. Hotard was allowed to use an ice pack at work and was allowed to work from home when needed. She Instated that Mrs. Hotard was even allowed to leave work freely for doctors’ appointments without receiving a dock in her pay.
At the conclusion of trial, the office of workers’ compensation judge took the matter under advisement. The court issued its judgment on June 6, 2011 which found, in pertinent part, that Mrs. Hotard’s claims were without merit. The court ordered Mrs. Hotard to reimburse Murphy Rogers all TTD benefits she had received before October 9, 2008 and after February 23, 2009. She was further ordered to reimburse all medical expenses incurred for treatment for aggravation of her preexisting cervical and shoulder injuries after the end of April, 2007. Mrs. Hotard appeals the trial court’s judgment.
Assignments of Error
Mrs. Hotard assigns the following errors:
1. the trial court committed reversible error by finding that her shoulder injury was not related to her work related injury;
2. the trial court committed reversible error by finding that all of her claims were meritless and should be dismissed at her costs;
3. the trial court committed reversible error by denying her request for carpal tunnel release;
4. the trial court committed reversible error by finding that Murphy Rogers was entitled to reimbursement of TTD benefits before October 9, 2008 and after February 23, 2009;
5. the trial court committed reversible error by finding that Murphy Rogers should receive reimbursement for all medical expenses incurred after April 2007; and
6. the trial court committed reversible error by failing to order supplemental earnings benefits and vocational rehabilitation.
| ¡Discussion

Standard of Review

In workers’ compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC’s findings of fact is the “manifest error-clearly wrong” standard. Dean v. Southmark Constr., 03-1051, p. 7 (La.7/6/04), 879 So.2d 112, 117, citing, Brown v. Coastal Constr. Engg, Inc., 96-2705 (La.App. 1 Cir. 11/7/97), 704 So.2d 8, 10. Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. Id. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Id., citing, Robinson v. North Am. Salt Co., 02-1869 (LaApp. 1 Cir. 6/7/03), 865 So.2d 98, 105. The court of appeal may not reverse the findings of the lower *412 court even when convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.

First Assignment of Error

In her first assignment of error, Mrs. Hotard contends that the trial court erred in failing to find that her shoulder injury was not related to her workplace fall.
Jurisprudence holds that because an employer takes his employee as he finds him, “a preexisting condition does not prevent recovery through workers’ compensation.” Tate v. Cabot Corp., 01-1652 (La.App. 3 Cir. 7/3/02), 824 So.2d 456, 461, citing, Curtis v. Wet Solutions, Inc., 98-0789 (La.App. 3 Cir. 12/9/98), 722 So.2d 421. Aggravation of a preexisting injury may constitute a disabling Iminjury when, for example, the plaintiff begins to suffer new symptoms after the second workplace accident. Id. (citation omitted) (emphasis added). The Third Circuit explained in Tate, supra:
[a] pre-existing disease or infirmity does not disqualify the claimant from receiving benefits if the workplace accident aggravated, accelerated, or combined with the disease to produce the disability for which compensation is claimed. Thus, the element of causation is satisfied if the employee’s work-related accident was a factor in bringing about the employee’s disabled status. Whether a causal relationship exists between the disability and the employment is a question of fact. The hearing officer’s determination in this regard cannot be reversed unless it is manifestly erroneous based on examination of the record as a whole.
The employee’s workplace accident is presumed to have caused or aggravated her disability when she proves that: (1) before the accident, she had not manifested disabling symptoms; (2) commencing with the accident, the disabling symptoms appeared; and (3) there is medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and activation of the disabling condition. Once an employee establishes the presumption of a casual [sic] relationship, the employer must produce evidence and persuade the trier of fact that it is more probable than not that the injury was not caused by the work accident.
Thus, “[t]he presumption of causation may attach to a claimant who exhibited symptoms of her allegedly disabling illness in the distant past provided that she had suffered no such symptoms immediately prior to her workplace accident.” Id. at 461, citing, Rideaux v. Franklin Nursing Home, 95-0240, p. 5 (La.App. 3 Cir. 11/22/95), 664 So.2d 750, 755.
Turning to the present case, it is undisputed that Mrs. Hotard suffered with preexisting degenerative disc disease. Thus, our inquiry is two-fold. First, we must determine whether Mrs. Hotard was asymptomatic immediately before the fall. Then, we must determine whether any aggravation of her preexisting condition resulted in a greater disability. See Clark v. Aqua Air Indus., Inc., 435 So.2d 492 (La.App. 5 Cir.1983).
InMrs. Hotard’s medical records reveal that she sustained injuries in a motor vehicle accident on June 18, 2004, and was diagnosed with degenerative cervical discs and a lumbar sprain. She remained under the doctors’ care until May 25, 2005, but it does not appear that her symptoms had completed resolved by that time. In fact, her medical records from that date state, “she has persistent symptoms that she feels are increasing”—evidencing that her symptoms were, in fact, ongoing. Mrs. Hotard returned to the doctor on October *413 24, 2006, with increasing pain in her neck, left shoulder, and left upper extremity, which Mrs. Hotard stated was precipitated by house and yard work Thus, disabling symptoms were immediately apparent three days before the workplace fall. As this Court stated, however, a plaintiff need not “be free from pain relating to the preexisting condition. Rather, the question is whether or not the subsequent injury causes a greater disability than that which existed prior to the accident.” Clark, supra, at 495 (emphasis in original). In this case, there is no evidence that Mrs. Hotard’s workplace fall caused a greater disability than her 2004 ear accident.
The record reflects that Mrs. Hotard rated her pain an 8 out of 10 after the car accident and after the workplace fall. She further stated, in both instances, that it felt as if she had broken her arm. In 2004, Mrs. Hotard said that she could not sit for long periods of time without discomfort. She further stated that she had to discontinue activities such as lifting baskets of clothes and playing basketball with her daughter. At the trial of this case, Mrs. Hotard similarly stated that sitting for long periods of time was bothersome— specifically stating that she could not go to the movies anymore and that she experienced spasms after sitting through Mass. She added that she could no longer participate in daily activities such as mopping, vacuuming, or cleaning the bathtub. Despite the similarities between Mrs. Ho-tard’s subjective complaints after the 2004 car accident and her workplace fall, |12she nevertheless contends that her injuries from the workplace fall were more significant because she is now no longer able to work.
The workplace fall occurred on October 27, 2006, but Mrs. Hotard maintained her employ with Murphy Rogers until September 7, 2007 — approximately nine months
after the accident occurred. Her resignation, however, was not precipitated by the insurmountable pain she contends to have experienced. Rather, the record reveals that she resigned due to a workplace grievance she had with a colleague. Three days later, on September 10, 2010, she began her new employment with Dutel and Tranchina where she remained until August 30, 2008. Thus, Mrs. Hotard was continuously employed for approximately two years after the workplace fall, which is almost the same amount of time that she worked after the 2004 car accident. In addition, the record supports a finding that Mrs. Hotard is, in fact, capable of working. The FCE described the limitations within which Mrs. Hotard could work. Drs. Todd, Finney, and Nutik opined that she could work within those limitations, and Dr. Applebaum opined that she could have returned to work within three to six months after the fall occurred. Dr. Bartholomew was the only doctor who determined that Mrs. Hotard could not work within the limitations set forth in the FCE.
Nevertheless, Mrs. Hotard urges this Court to give great weight to Dr. Finney’s finding that the labral tear was associated with the workplace fall. We note, however, that Dr. Finney testified more specifically that the labral tear was associated with an acute trauma, which he identified as the workplace fall. That opinion, however, was qualified on Mrs. Hotard’s misrepresentation that she had not sustained any previous shoulder injury. Thus, the workplace fall was the only acute trauma upon which Dr. Finney could relate the labral tear. And because Mrs. Hotard was not forthcoming about her preexisting shoulder injury, Dr. Finney’s |1sopinion was based on unreliable information. Nevertheless, the trial court allowed Mrs. Hotard to retain the TTD benefits she received between October 9, 2008, the day the arthroscopy was performed, and Feb *414 ruary 22, 2009, the day before she was released to return to work.
The findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. Dean, supra. Based on the entirety of the record, we cannot say that the trial court was manifestly erroneous in finding that Mrs. Hotard’s shoulder injury was not caused or aggravated by the workplace fall such that it resulted in a compensable injury. As a result of this finding, the remaining assignments of error are rendered moot. The judgment appealed from is affirmed.

AFFIRMED