613 So.2d 1107 (1993)
Michael BATES, Plaintiff-Appellee,
v.
CITY OF CROWLEY, Defendant-Appellant.
No. 92-22.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1993.
Rehearing Denied March 22, 1993.
*1108 Michael B. Miller, Crowley, for plaintiff-appellee.
Laura K. Austin, Thomas H. Morrow, for defendant-appellant.
Before GUIDRY, STOKER and COOKS, JJ.
GUIDRY, Judge.
Defendant, the City of Crowley, appeals a judgment of a Louisiana Department of Labor Worker's Compensation Hearing Officer finding claimant, Michael Bates, entitled to supplemental earnings benefits, vocational rehabilitation, penalties and attorney's fees. Claimant answered the appeal seeking an increase in attorney's fees for defense of this appeal.
On appeal, defendant argues, among other issues, that the hearing officer erred in finding claimant entitled to supplemental earnings benefits. Inasmuch as we find merit to that argument and reverse based on that issue, we pretermit consideration of the other issues argued by appellant.
Bates was originally hired by the City of Crowley as a laborer in October of 1986. Bates claimed that he was initially injured in June of 1987 (later established to be April 1987) while loading a large tree limb or log into the back of a city truck. X-rays taken at this time showed claimant to have a Class IV back, due to preexisting degenerative changes in his spine. Bates was treated by Dr. Thomas McNeely and missed three weeks of work. According to Bates, he returned to work without fully recovering from the incident. He contends that he continued to experience neck and back pain and that, finally, on January 27, 1989, while working on a ditch crew, the pain became so severe that he was unable to continue working. Between the two above dates, Bates performed all regular work duties without complaint or missed work.
The Employer's Report of Occupational Injury or Disease reflects that Bates reported he was cleaning out a ditch with a shovel when he felt a sharp pain in his lower back. The accident report makes no mention of any prior accident and in deposition Bates stated that he could not say exactly how he injured his back on January 27, 1989. He was paid compensation from January 27, 1989 through February 7, 1990.
Bates contended, in deposition, that following the accident he experienced back, neck, arm, leg and chest pain and decreased sexual activity. However, medical records do not support all of these varied complaints. Following the January 27th incident, Bates returned to Dr. McNeely, complaining only of lower back pain. After following Bates for approximately three weeks, Dr. McNeely turned over plaintiff's care to Dr. Gregory Gidman, an orthopedic surgeon.
Dr. Gidman, who first saw Bates on February 22, 1989, concluded that Bates had suffered a lumbar strain. Neither Dr. Gidman's physical examination of plaintiff nor *1109 x-rays revealed any cervical injury. Dr. Gidman recommended a CT scan, myelogram, physical therapy and continued medication.
The CT scan revealed degenerative changes to the lumbar area which is consistent with Dr. McNeely's earlier findings that Bates suffered from a Class V back that pre-dated the January 27, 1989 accident. Dr. McNeely, in connection with a pre-employment physical for Capitol Manufacturing Company on April 27, 1988, had concluded that Bates was not acceptable for work based on plaintiff having a Class V back. Dr. Gidman noted a slight bulge at L3-4 and a moderate bulge at L4-5. Dr. Gidman concluded that Bates had marked degenerative arthritis of his lumbar area. He recommended a myelogram and post-myelogram CT scan of the cervical and lumbar spine. Dr. Gidman referred Bates to Dr. Thomas Bertuccini, a neurosurgeon, for consultation.
Dr. Bertuccini felt that the cervical myelogram showed mild degenerative changes while the lumbar myelogram showed a slight bulge at L3-4 and L4-5 with a slight underfilling of the L5 nerve root on the left. Dr. Bertuccini did not feel that this was a clinically significant finding. Dr. Bertuccini noted that the post-myelogram CT scan showed mild degenerative changes in the neck which were nonsurgical. Dr. Bertuccini concluded that the disc bulging at L3-4 and L4-5 were not significant. Physical examination was normal. In the cervical area there was no spasm and range of motion was full. Bates exhibited no focal weakness, reflex or sensory abnormality in his upper extremities and no tenderness was noted in the low back area, neither was any spasm noted. Dr. Bertuccini noted that movement at the waist was somewhat limited, but that it did not cause leg pain symptoms. Bates had normal motor tone and strength in his leg muscles. A straight leg raising test was normal. Sensory examination was normal, as were reflexes.
Dr. Bertuccini concluded that Bates' neck and back pain was likely the result of a musculoligamentous strain, recommended continued conservative treatment, and opined that Bates' symptoms did not demonstrate a surgical problem.
Bates returned to see Dr. Gidman on May 10, 1989. Although plaintiff continued to complain of neck and back pain, Dr. Gidman agreed with Dr. Bertuccini's conclusions that Bates' complaints were the result of a ligamentous strain and that no surgery was necessary.
Dr. Gidman last saw Bates on June 28, 1989. He noted that Bates was complaining of swelling on the left side of his neck. Physical examination revealed no swelling present. Dr. Gidman concluded that Bates' attitude was "poor". Dr. Gidman concluded that:
"I think, at this time, it is my feeling that the patient does have some degenerative arthritis to the neck and lumbar spine but I do not feel it completely incapacitates him. As far as I am concerned, I think the patient could return to moderate work with maximum lifting of approximately 50 pounds of weight. He is quite displeased with me and my recommendations. I am equally displeased with him. I think there is a personality conflict here. I don't have anything further to offer this individual, and the patient has no interest in returning to this office. I personally would suggest an MMPI to see if there is any psychological overlay to his complaints..." (June 28, 1989 report of Dr. Gidman).
Bates next saw Dr. Jack Hurst, a Lafayette neurosurgeon, on August 16, 1989 on referral from his attorney. After reviewing the diagnostic studies performed on Bates and, considering Bates' physical examination and subjective complaints, Dr. Hurst felt that a cervical and lumbar discectomy would probably alleviate plaintiff's symptoms.
Risk Management, who was handling Bates' claim for the City of Crowley, had plaintiff examined by Dr. Anthony S. Ioppolo, a neurosurgeon, on September 14, 1989. Dr. Ioppolo observed, "The patient appeared to be in good general health and moved around without any difficulty". He *1110 recommended continued conservative care including physical therapy.
On October 25, 1989, Dr. Hurst recommended that Bates attend a functional capacity evaluation and possibly a work hardening program. Dr. Hurst noted that Bates was irate at this recommendation. Dr. Hurst noted that Bates was more interested in receiving pain pills.
Bates did participate in a work capacity evaluation at the Center for Work Rehabilitation on December 19, 1989. Ms. Catherine Carlisle, who performed the evaluation, stated the following in her report to Dr. Hurst:
"I found Mr. Bates to be somewhat antagonistic during the evaluation. During the initial interview, he seldom made eye contact and offered very little information when questioned. ..."
After noting no less than seven inconsistencies during plaintiff's evaluation, Ms. Carlisle concluded:
"At this time, it is my professional opinion that this client is magnifying his pain symptoms in a conscious effort to control his environment. This is not to imply that this client is not experiencing some real pain, but I do feel he is consciencly [sic] limiting his physical abilities."
Dr. Hurst noted that Bates did not complain of arm pain until February 14, 1990, and did not ever complain of chest pain or decreased sexual activity.
On March 19, 1990, Dr. Hurst had an opportunity to view February 2, 1990 and March 9, 1990 video tapes of Bates chopping wood, carrying two large iron pots, carrying steel tire rims and performing various bending, stooping and twisting movements. After viewing the films, Dr. Hurst concluded that Bates had lied to him about his physical condition and had "duped" him into recommending surgery. Dr. Hurst explained that his recommendation regarding surgery had been based on a combination of the diagnostic studies, physical examination and subjective complaints. Dr. Hurst felt that Bates was manipulating him, his employer and the entire workers' compensation system.
Dr. Hurst explained that while the degenerative changes in plaintiff's spine as revealed by the various diagnostic studies were real, it did not follow that they were symptomatic. According to Dr. Hurst, the condition of Bates' back would not be unexpected in a person of Bates' age and work history and that in order to be significant, the findings must be correlated with subjective complaints.
Dr. Hurst was convinced that if the defects revealed by Bates' diagnostic studies were actually symptomatic, Bates could not have possibly been able to engage in the various activities documented on the video tapes. Bates' activities on the tape also led Dr. Hurst to conclude that he needed neither surgical intervention nor any other continuing medical treatment; and, while Dr. Hurst admitted having no detailed knowledge of plaintiff's duties with the City of Crowley, he did state that if the duties were similar to and consistent with the activities Bates performed on the video, he would have no objection to Bates returning to his former job.
Bates then consulted a Lake Charles neurosurgeon, Dr. William F. Foster, on May 15, 1990. Dr. Foster's impression of plaintiff's condition did not markedly differ from that of the other doctors plaintiff had consulted. Dr. Foster merely recommended the repeat of several diagnostic studies.
The first full hearing on this case was held August 27, 1990. Following that hearing, the hearing officer stated the following:
"Mr. Bates claims that the stopping of the compensation payments on February 7th, 1990 was improper, and further claims that his lost time has not ended. Based on the evidence before me today, I find that his weeklythat the termination of his weekly benefits was proper under the circumstances.
The medical evidence shows that Mr. Bates did have an aggravation of the preexisting degenerative condition which was initially noted by Dr. McNeely in 1987. It is clear that the diagnostic tests reveal positive findings and that on at *1111 least one occasion Dr. Hurst found objective or noted objective findings on his examination of muscle spasm.
However, based on the numerous medical reports and Dr. Hurst's deposition, I must conclude that Mr. Bates, as of February 7th, his condition was such that he was no longer temporarily totally disabled. In reviewing the medical records, however, I do note that Dr. Hurst has suggested counseling. That Dr. Gidman suggested that an MMPI might be appropriate and that Dr. McNeely recommended vocational realignment, whatever that is.
... [H]owever, I am somewhat concerned about his returning to work as a laborer because based on Dr. McNeely's report which has been introduced into evidence as P-1, as well as the positive diagnostic findings, I'm not certain that medically he should do that at this point. Therefore, I am going to leave the question open, the counseling question open as far as medical care is concerned and vocational question open. And I would ask that all of you work together to try to help Mr. Bates find some means of employment either with the City or elsewhere. And we'll just leave those open."
A second hearing on the case was held March 21, 1991. Following that hearing, the hearing officer ruled Bates entitled to SEB beginning February 7, 1990, vocational rehabilitation, penalties and attorney's fees plus interest on all past due amounts.
Several significant events took place between the August 27, 1990 hearing and that of March 21, 1991. Dr. McNeely saw Bates on September 7, 1990, for a re-employment physical at the request of the City of Crowley and placed severe restrictions on Bates' employmentno lifting of more than 10 pounds and no bending. When questioned about the basis for these restrictions in deposition, Dr. McNeely replied, "I would say that first and foremost the simple fact that back x-rays were Class V, that was the overriding consideration... [M]y opinion was somewhat colored by the fact he still professed to have intermittent back pain.... However ... I would have disqualified him ... had he not had symptoms because of the back".
However, Dr. McNeely did not take any additional x-rays at that time, but rather relied on those he had previously taken and on which he had relied to classify plaintiff's back as Class V on April 26, 1988, nine months before plaintiff's January 27, 1989 incident.
Dr. McNeely explained that the focus of his evaluations was different depending on whether he was treating a patient or whether he was performing an employment physical. He stated that if he sees a person who is already employed and who has been injured, he is not asked to say whether the person is "employable" because he is already employed. On the other hand, if he sees a person who is seeking employment, Dr. McNeely has latitude to disqualify him or her purely on objective findings noted during the examination.
Also following the August 27, 1990 hearing, the City paid for Bates to begin rehabilitation counseling in October. This service continued for two months until, at an informal conference between all parties and the hearing officer, Bates indicated that he would like to return to his former job with the City. The City of Crowley acted promptly to offer Bates re-employment at his former position and rate of pay. However, Bates failed both to show up for work or to offer any written or verbal "excuse" for not reporting. At the second hearing, he stated that he just thought he couldn't do the work.
In brief, plaintiff argues that this court should not place too much emphasis on the video tapes entered into evidence. He quotes from Arriaga v. Reliance Insurance Company of Illinois, 564 So.2d 832 (La.App. 3rd Cir.1990), wherein a panel of this court stated:
"Clearly, the trial court gave great weight to a videotape introduced into evidence which shows plaintiff performing chores and engaging in other physical activities outside his house. Defendants had surveillance conducted of plaintiff on four separate occasions. As noted by our Supreme Court in Orgeron v Tri-State *1112 Road Boring, Inc., 434 So.2d 65 (La.1983), this form of evidence must be approached very cautiously because it shows only intervals of the subject's activities, it does not show rest periods, and it does not reflect whether the subject is suffering pain during or after the activity. After carefully reviewing the videotape, we find that it demonstrates merely that plaintiff can perform some physical activity. We do not find that it proves that plaintiff can return to work involving manual labor. Thus, we conclude that the trial court placed an inappropriate amount of weight on the videotape."
As stated previously, benefits were terminated on February 7, 1990 based on a February 2, 1990 video tape. Another video was taken of plaintiff's activities on March 9, 1990. Dr. Hurst, who reviewed the tapes (albeit a condensed version) opined that if the defects documented in Bates' diagnostic studies were actually symptomatic, it would have been physically impossible for Bates to perform the physical activities depicted in the video. This case is markedly different from both Arriaga, supra, and Orgeron, supra, wherein both of those plaintiffs had been assigned a 30-50 percent disability rating following their accidents.
It is well settled that an employer or its insurer may discontinue worker's compensation benefits when an employee recovers from his injury. Bertrand v. Patterson Truck Line, 138 So.2d 663 (La.App. 3rd Cir.1962), certiorari denied (La.1962). Further, as our brethren of the First Circuit observed in Monistere v. Louisiana Department of Hospitals, 273 So.2d 594 (La. App. 1st Cir.1973):
[I]t has been repeatedly held that so long as the employee is disabled from the aggravation of a pre-existing defect, he is entitled to compensation. However, where the aggravation ceases and the employee's continued disability, if any, results solely from the pre-existing defect, compensation is no longer due. See for example, Broussard v. R. H. Gracey Drilling Company, 227 La. 882, 80 So.2d 850. See also, Lott v. Southern Farm Bureau Casualty Insurance Co., La. App., 135 So.2d 502, and cases therein cited.
In the case at bar, plaintiff was diagnosed as having a Class V back more than nine months before his "accident" but was able to perform all the duties of his job throughout that period. At least two physicians who examined or treated Bates alluded to his possible malingering. Malingering was also strongly suggested by Ms. Carlisle who did a work capacity evaluation of Bates. In any event, all of the medical evidence, without contradiction, supports a finding that by February 7, 1990 Bates had completely recovered from the lumbar strain suffered in the January 27, 1989 accident and the aggravation of his pre-existing condition had ceased. Under these circumstances, plaintiff was no longer entitled to worker's compensation and the hearing officer clearly erred in holding otherwise. While we are cognizant of the fact that a trial court's factual findings concerning work-related disability are to be accorded great weight on appeal, see Arriaga, supra, we determine that in this case those factual findings, reached after the second hearing, were clearly wrong.
Accordingly, for the reasons stated, the judgment of the hearing officer is reversed and plaintiff's suit is ordered dismissed. Plaintiff-appellee is cast with all costs at the trial level and on appeal.
REVERSED AND RENDERED.