STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-265


THOMAS SHARBONO

VERSUS

FIRE SAFETY SALES AND SERVICE, ET AL.


************

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 3,
PARISH OF CALCASIEU, NO. 02-03614,
SAM LOWERY, WORKERS' COMPENSATION JUDGE

************

**MICHAEL G. SULLIVAN**
**JUDGE**

************

Court composed of John D. Saunders, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.


**AFFIRMED.**

Aubrey E. Denton
Attorney at Law
Post Office Drawer 52110
Lafayette, Louisiana   70505-2110
(337) 289-9151
Counsel for Plaintiff/Appellee:
        Thomas Sharbono

Mark L. Riley
Onebane Law Firm
Post Office Box 3507
Lafayette, Louisiana  70502-3507
(337) 237-2660
Counsel for Defendants/Appellants:
        Fire Safety Sales and Service
        Highlands Insurance Company

SULLIVAN, Judge.

The issue presented by this appeal is whether the workers' compensation judge (WCJ) erred in reinstating temporary total disability and medical benefits based upon a finding that the claimant was still suffering from a work-related aggravation of his pre-existing multiple sclerosis (MS). For the following reasons, we affirm.

**Discussion of the Record**

Thomas Sharbono, a fire alarm technician employed by Fire Safety Sales and Service, was injured on May 19, 2000, when the company vehicle in which he was a passenger was rear-ended and then pushed forward into another vehicle.[1] He described the accident as producing a "heavy impact" that snapped his head against the headrest. He was treated later that day at a hospital emergency room for neck and shoulder pain. Mr. Sharbono did not return to work after this accident, and his employer paid him temporary total disability benefits for approximately two years, from the date of the accident through May 8, 2002.

It is undisputed that Mr. Sharbono was under active treatment for MS at the time of the accident. Although he may have been diagnosed with MS as early as 1989 or 1990, he did not receive any treatment for the disease until August of 1999, when he reported symptoms of blurred vision, muscle spasms, memory problems, fatigue, and bladder dysfunction to Dr. Annette Howard, a neurologist in Houston, Texas. Dr. Howard, who treated Mr. Sharbono before and after the May 2000 accident, initially ordered a course of steroid injections administered at Methodist Hospital in Houston. Because Mr. Sharbono reported a worsening of his MS symptoms after the accident, Dr. Howard initiated two rounds of high dose, intensive intravenous steroids in June and July of 2000. By September 2000, Dr. Howard

---

[1] Fire Safety Sales and Service is insured by Highlands Insurance Company, also a Defendant in this case.

believed that Mr. Sharbono's condition was stable, but she did not discharge him at that time. When questioned about the effect of trauma on the MS disease process, Dr. Howard stated that, while there is some belief that stressors do have an impact on chronic illness, medicine has been unable to quantify that relationship. Dr. Howard "absolutely" believed that trauma has a bearing on any medical condition, and she disagreed that all studies suggested that such a relationship did not exist. She stated that, generally, physicians believed that there is a relationship between trauma and chronic illness, but she could not say how much of an impact certain stressors had on the disease process.

Mr. Sharbono began treating with Dr. Maureen Lannan, a family practitioner in Sulphur, Louisiana, shortly after the accident. On May 23, 2000, Dr. Lannan diagnosed a flexion-extension injury, noting that Mr. Sharbono exhibited only 50% range of motion of the neck in almost all directions, with pain and tenderness in the left shoulder and left trapezius muscle. On June 5, 2000, Dr. Lannan found that Mr. Sharbono's neck range of motion had improved to 75%, with some soreness remaining, but that he had developed headaches in the right occipital region, leading her to question whether there was some MS involvement with the injury. By June 17, 2000, Dr. Lannan believed that Mr. Sharbono was having an MS flare. He still had spasms of the left neck, but added to these were spasms in the left arm and in the legs. Dr. Lannan considered these to be new findings that could have been precipitated by the accident because of the MS flare. At this time, Mr. Sharbono expressed an interest in returning to work, but he could not do so because of the muscle spasms. When Mr. Sharbono's neck had not improved by September 13, 2000, Dr. Lannan

2

ordered an MRI, which revealed a small focal herniation at C5-6, centrally and slightly to the left.

Dr. Lannan continued to see Mr. Sharbono through July of 2002, during which time she documented his deteriorating condition. In March of 2001, she noted that he had marked decrease in range of motion in the neck, marked deterioration in speech, and more spasticity in the arms and legs. In July 2002, she noted that he had not improved to his pre-accident condition and she doubted whether he would ever reach that level again. Dr. Lannan believed that the motor vehicle accident precipitated the MS flare, noting the severity of symptoms that chronologically followed the accident. She stated that trauma precipitating MS flares has been documented, but as a doctor, she could not determine how much of the MS was related to the accident. She described the situation as a "gray hodgepodge" in which she could not separate his neck problems from the MS.

While under Dr. Lannan's care, Mr. Sharbono was also seen by a neurosurgeon, Dr. Eric Wolf, and by two neurologists, Dr. Alan Sconzert and Dr. Robert Martinez. Dr. Wolf treated Mr. Sharbono from October 2000 through March 2001, noting that steroid injections for his neck pain appeared to afford some relief. Based upon the patient's history, Dr. Wolf believed that Mr. Sharbono did sustain an aggravation or exacerbation of his MS, and he agreed that such an exacerbation would still be ongoing if the patient were still experiencing symptoms.

Dr. Sconzert believed that the motor vehicle accident initially had a dramatic impact on Mr. Sharbono's MS, but he stated that the impact should be less dramatic over the course of the disease. According to Dr. Sconzert, "there's no question" that trauma makes pre-existing MS worse, at least temporarily, but the real question is

3

what happens long term. He explained that MS often gets worse anytime the energy expended to treat it is diverted, and he believed that this accident caused the patient to have less energy and more susceptibility to fatigue. He could not say definitely that the accident had some progressive impact on the MS, but he believed it was possible that the accident affected the MS in a negative fashion. Although he stated that there was a strong supposition among neurologists that any injury has an eventual impact on the MS because of the diversion of the body's defenses against the disease, he could not quantify that impact.

Dr. Martinez agreed that a motor vehicle accident can and does exacerbate MS symptomatology, and he further stated that if the aggravation is significant enough, it may produce permanent problems that would not have otherwise occurred. He also stated that an MS patient may recover from a relapse of symptoms, but that the patient may never return to baseline. Mr. Sharbono reported to Dr. Martinez that he was stable until May of 2000, when his condition began to deteriorate with added complaints after the automobile accident. Dr. Martinez compared the written reports of MRIs taken before and after the accident, noting that they appeared similar, but because of his inability to view the actual films, he could not say for certain whether there had been a change.[2] He believed it possible that the trauma of the accident could have set in progress more problems than Mr. Sharbono would have had without the accident, but he believed this to be a "toss-up." Dr. Martinez was impressed with Mr. Sharbono's "heavy decision" to take himself out of the labor market as a sign of a "real problem," and he noted, by the patient's history, that Mr. Sharbono had more problems after the accident than before. With the knowledge that trauma can produce

---

[2]Many of Mr. Sharbono's medical records from Houston, including the films of his pre-accident MRI, were destroyed in a flood in 2001.

an MS exacerbation and assuming Mr. Sharbono's history was accurate, Dr. Martinez concluded it was more probable than not that the increase in symptoms was related to the accident.

At Defendants' request, Mr. Sharbono was examined by Dr. Antonio Stazio, Director of the Tulane Medical Center MS Clinic, on July 19, 2002. Dr. Stazio described MS as a progressive disease of the central nervous system that cannot be cured, but can be controlled with medication to slow its progression. Dr. Stazio expressed his personal belief that the effect of trauma on MS has never been clearly demonstrated in the medical literature, noting that evidence of such a connection is mostly from anecdotal reports by doctors who believe their patients have deteriorated. He explained that an MS patient may become more uncomfortable and more symptomatic after trauma, but he did not believe that trauma resulted in a new MS lesion. He acknowledged that one prominent neurologist has advanced the hypothesis that MS can indeed be aggravated by trauma that produces a breakdown in the blood-brain barrier, thereby allowing white cells responsible for the MS lesion to attack the brain. However, he was not aware of any medical studies that supported this theory.

In reviewing Mr. Sharbono's medical records, Dr. Stazio commented on the lack of a comprehensive neurological report from Dr. Howard, but he pointed out that numerous handwritten notations in Dr. Howard's records indicated that Mr. Sharbono was suffering from great pain, confusion, dizziness, and muscle spasms well before the accident in May of 2000. He also noted that Dr. Wolf, who treated Mr. Sharbono post-accident with physical therapy and steroid injections, discharged him in March of 2001 with the assumption that he had reached maximum medical benefit.

5

Dr. Stazio did not believe that Mr. Sharbono's medical records contained the detailed documentation necessary to support a causal relationship between the accident and an exacerbation of the MS.

After taking the matter under advisement, the WCJ found that Mr. Sharbono proved "barely, with no room to spare," that he was still suffering from an accident-related exacerbation of his MS. The WCJ stated that he reached this conclusion primarily on the lay testimony, given that the medical opinions in the case were "either in conflict or inconclusive."

## Opinion

On appeal, Defendants object to the findings that Mr. Sharbono sustained an aggravation of his MS and that such an aggravation is ongoing. They point to the disagreement among the medical professionals, to testimony from Dr. Howard that she did not see any patterns of change after the accident, and to notations in the medical records that Mr. Sharbono reached maximum medical improvement from the accident sometime in 2001. They also argue that the practical effect of the WCJ's ruling is to render them responsible for Mr. Sharbono's MS treatment for the rest of his life.

An appellate court may not set aside the WCJ's factual findings unless they are manifestly erroneous or clearly wrong. *Alexander v. Pellerin Marble & Granite*, 93-1698 (La. 1/14/94), 630 So.2d 706; *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Even though an appellate court may believe that its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility should not be disturbed on review where there is conflict in the testimony. *Freeman v. Poulan/Weed Eater*, 93-1530 (La. 1/14/94), 630 So.2d 733.

6

In *Baker v. Conagra Broiler Co.*, 93-1230, pp. 8-9 (La.App. 3 Cir. 5/4/94), 640 So.2d 494, 498, *writ denied*, 94-1435 (La. 9/23/94), 642 So.2d 1289 (citations omitted), we summarized the jurisprudence pertaining to a worker with a pre-existing condition as follows:

> In compensation cases, the claimant has the burden of showing that more probably than not an employment accident occurred and that it had a causal relation to the disability suffered. A worker's preexisting condition does not bar his or her recovery under the workers' compensation laws because an employer takes the worker as he finds him or her. An abnormally susceptible worker is entitled to no less protection under the workers' compensation statute than a healthy worker. It is immaterial that the diseased or weakened condition of the worker might eventually produce the disability suffered outside of the employment situation. Said another way, the worker's claim for disability benefits will not be disqualified if the work-related injury aggravates, accelerates, or combines with a disease or infirmity to produce death or disability for which compensation is claimed.
>
> Whether there is a causal relationship between the disability and the employment is a question of fact. A factual determination by the hearing officer cannot be reversed unless the hearing officer was clearly wrong from an examination of the record as a whole.

"[I]t has been repeatedly held that so long as the employee is disabled from the aggravation of a pre-existing defect, he is entitled to compensation. However, where the aggravation ceases and the employee's continued disability, if any, results solely from the pre-existing defect, compensation is no longer due." *Moss v. Winward Hosp.*, 98-401, p. 12 (La.App. 3 Cir. 10/7/98), 720 So.2d 107, 113, *writ denied*, 98-2812 (La. 1/8/99), 735 So.2d 635 (quoting *Bates v. City of Crowley*, 613 So.2d 1107, 1112 (La.App. 3 Cir.), *writ denied*, 619 So.2d 545 (La.1993)).

Frustrated by the inconclusive medical opinions in this case, the WCJ cited the following passage from *Hebert v. Fifteen Oil Co.*, 46 So.2d 328 (La.App. 1 Cir. 1950), a case that awarded workers' compensation benefits for the traumatic aggravation of a dormant MS condition:

7

Finding itself with medical evidence which is confusing and lacking, this court is compelled to reach a decision which will do equity to the parties. The court is not unmindful that, as in all other civil cases, the plaintiff must prove his case by a preponderance of the evidence. However, it has been repeatedly held by the Louisiana courts that when medical testimony is too vague, indefinite, confusing or contradictory for the courts to draw upon said evidence for an intelligent conclusion that the court should look to lay testimony and the circumstances surrounding the issues in the case in order to arrive at an equitable conclusion. . . . "It is thus to be seen that we are confronted with a deplorable and irreconcilable conflict in the testimony of members of the medical profession relative to an important issue in the case. When situations of this kind are at hand, and such are not infrequent, the court must look to the lay testimony and to the other evidence for assistance in its endeavor to do justice between the parties."

*Id*. at 331 (citations omitted) (quoting *Hennen v. La. Highway Comm'n*, 178 So. 654, 656 (La.App. 2 Cir. 1938)).

In the present case, Defendants rely heavily on Dr. Howard's opinion that Mr. Sharbono's condition essentially remained unchanged from when she first saw him in August of 1999, through his last visit in September of 2000. However, it appears undisputed that, from August of 1999 until the accident in May of 2000, Mr. Sharbono was able to work, notwithstanding his MS symptoms, but that after the accident he was not. Mr. Sharbono's physical decline after the accident is well-documented by Dr. Lannan. In June of 2000, Dr. Lannan did not believe Mr. Sharbono was capable of working due to his increasing spasticity in muscles, even though he desired to return to his former job. In July of 2002, Dr. Lannan believed that Mr. Sharbono would never return to his pre-accident capabilities. According to Mr. Sharbono, he did not have neck and shoulder pain before the accident, but he was still experiencing pain in those areas at the time of trial. He also stated that the fatigue and confusion he experienced before the accident did not interfere with his job, but now those symptoms are worse and he must deal with them

8

daily. He testified that before the accident he became certified to work in Texas, but he was not able to use that additional training because of the accident. Dr. Martinez considered it a "heavy decision" that Mr. Sharbono took himself out of the labor market and an indication that he had a "real problem."

Although the medical opinions differed greatly as to the effect of trauma on MS, almost all of the physicians who actually treated Mr. Sharbono believed that the accident had some impact on the course of his disease. Dr. Lannan believed the accident precipitated an MS flare. Dr. Wolf believed that Mr. Sharbono had an exacerbation of his MS, based upon the history given by the patient. Dr. Martinez believed it more probable than not that, again based upon the patient's history, his increase in symptoms was due to an aggravation brought on by the accident. Dr. Martinez further stated that there are no guidelines on the length of an aggravation and that a patient may not return to his baseline before the aggravation. The history given to Dr. Martinez—that Mr. Sharbono was stable before the accident—appears to be supported by the record.

According to Dr. Martinez, we now have the ability to treat MS to reduce the cascade of disability it produces, although the disease is always progressive. Dr. Howard spoke of symptoms worsening in terms of decades. Yet, Mr. Sharbono's medical records indicate a rapid decline after the accident. Although we, too, are frustrated by divergent medical opinions in this case, we do not find that the WCJ erred in concluding that Mr. Sharbono is still suffering from a work-related aggravation of his MS.

**Decree**

For the above reasons, the judgment of the Office of Workers' Compensation is affirmed at Defendants' costs.

**AFFIRMED.**