MARC E. JOHNSON, Judge.
|2In this workers’ compensation dispute, Defendant, Jefferson Parish Hospital Service District # 2, d/b/a East Jefferson General Hospital (“EJGH”), appeals the trial court’s judgment in favor of Claimant, Sanjanette Rixner, finding her preexisting condition was aggravated by her three work-related accidents and awarding workers’ compensation benefits and penalties. For the reasons that follow, we affirm in part, reverse in part and remand.

FACTS & PROCEDURAL HISTORY

Claimant worked as a registered nurse for EJGH from March 2007 through June 13, 2013. On December 8, 2011, Claimant allegedly injured her back during the course and scope of her employment while helping transfer a patient from a bed to a wheelchair. Thereafter, on October 2, 2012, Claimant suffered a second work-related accident when she stepped on a rug that shifted, causing her to fall onto her right knee and land on her back and buttocks. Two months later, on | ¡¡December 13, 2012, Claimant had a third work-related accident when she experienced left arm pain after helping turn a 600 lb. patient.
Claimant filed three separate disputed claims for compensation, which were consolidated for purposes of trial.[1] The matter proceeded to trial on August 27, 2014. At trial, the parties stipulated that Claimant was in the course and scope of her employment at the time of all three accidents. They further stipulated that all related medical bills were paid by EJGH except for those incurred by Claimant’s treatment with Dr. Horace Mitchell, Dr. Tarun Jolly, Dr. Christy Montegut, Dr. Eric Lonseth, Dr. Cuong Bui, and a portion of her treatment with Dr. Robert Dale. .
The record shows that' Claimant was involved in three motor vehicle accidents in 2004, 2005 and 2007, in which she sustained cervical and lumbar injuries. After the 2007 motor vehicle accident, Claimant treated with Dr. Rand Voorhies, a neurosurgeon, who recommended cervical surgery for disc herniations that were compressing on her spinal cord.[2] Dr. Voorhies noted that although Claimant’s physical examination was relatively normal, she had “a really terrible spine problem and abnormalities in the cervical region” and required “a very extensive surgical procedure to attempt to deal with those problems.” Dr. Voorhies opined at the time that Claimant was “at a high risk for a sudden catastrophic and irreversible sudden deterioration if she was involved in any injury no matter how slight.” He further noted that Claimant’s condition could not heal itself and that she would always have some degree of cord compression as a result of the 2007 injury. Despite Dr. Voorhies’ recommendation, Claimant declined surgery.
| ¿Claimant continued to work for EJGH after the 2007 accident with no problems; however, her medical records show periodic treatment for cervical and lumbar pain *680 from 2007 until the first work-related accident on December 7, 2011. ' Notably, in-August 2011, Claimant saw Dr. Eric Lon-seth, a pain managemént specialist, with complaints of neck pain radiating into both shoulders and low back pain radiating into both buttocks. Dr. Lonseth ordered a lumbar MRI, which was essentially normal. He then prescribed physical therapy for Claimant. The record does not indicate the duration of physical therapy or contain any follow up visits to Dr. Lonseth prior to Claimant’s December 2011 work-related accident.
On December 7, 2011, Claimant was working as ,a recovery room nurse in the gastrointestinal clinic. She was helping transfer a patient from a bed to - a wheelchair when she felt a burning, aching pain in her lower back. The next day, Claimant sought treatment with Dr. Brett Rothaer-mel, a physiatrist, at the East Jefferson Occupational Medicine Clinic. Her main complaint was back pain. Dr. Rothaermel diagnosed Claimant with a lumbar sprain/ strain and placed her on light duty with instructions to avoid repeated bending, twisting and lifting, and to avoid lifting, pulling or pushing more than 25 lbs.
Claimant returned to Dr. Rothaermel on December 14, 2011. At that time, he prescribed physical therapy and returned her to regular duty. EJGH approved the physical therapy request, and Claimant began physical therapy in January 2012.
Claimant next saw Dr. Rothaermel on January 18, 2012, with continued low back pain but no radicular pain, numbness or tingling. Dr. Rothaermel ordered a pelvic and a lumbar MRI and instructed her to continue physical therapy. EJGH approved the tests and Claimant had the MRIs on January 19, 2012. The pelvic MRI showed no significant findings. The lumbar MRI showed stable mild facet ar-thropathy at L4 through SI,- but was otherwise normal with no spinal stenosis or Ldisc herniation. Claimant returned to Dr. Rothaermel on January 23, 2012, and the results of her MRIs were reviewed. Claimant told Dr. Rothaermel that she had been previously told she had a lumbar disc herniation; however, Dr. Rothaermel reviewed the August 2011 lumbar MRI and noted it was normal. He recommended she continue with physical therapy. Dr. Rothaermel noted that Claimant declined a referral for a second opinion.
Claimant missed her next two scheduled appointments with Dr. Rothaermel and did not return to see him until February 6, 2012. At that time, Claimant continued to complain of back pain, but also complained of radicular pain into her right buttock and leg with paresthesia and leg weakness. Dr. Rothaermel noted that Claimant’s rad-icular complaints were becoming more prominent. Although the MRI failed to find a clear etiology, Dr. Rothaermel noted there may be possible neuroforaminal narrowing associated with the facet arthropa-thy. . He recommended Claimant .continue with physical therapy[3] and referred her. to Dr. Lonseth for consideration of interven-tional pain management consisting of lumbar facet joint injections or epidural steroid injections. Dr. Rothaermel continued Claimant on regular duty, but limited her to eight-hour shifts. Claimant testified that EJGH accommodated all her job restrictions and she continued to work.
The record shows that EJGH approved Claimant’s referral to Dr. Lonseth for treatment; however, there is nothing in the record to show that Claimant followed through with this referral despite her treatment with Dr. Lonseth four months before her work-related accident.
*681 On March 16, 2012, Dr. Rothaermel requested a course of chiropractic care for Claimant after she reported limited benefit from physical therapy. He noted that the interventional pain management consult had yet to take place, but believed | ^chiropractic care with a possible facet joint injection would help Claimant reach maximum medical improvement. EJGH approved the chiropractic care the same day, and Claimant immediately started treating with chiropractor Dr. Robert Dale for back pain.
On April 11, 2012, Dr. Dale requested eight additional chiropractic treatments, noting that six had already been done with Claimant showing improvement. On May 30, 2012, Dr. Dale recommended Claimant undergo an EMG/Nerve Conduction Study (NCS) of the right leg to determine if there was nerve root impingement in the lumbar spine. On August 14, 2014, EJGH sent a letter to Dr. Dale informing him that he was treating Claimant without authorization and advised him that further treatments needed to be authorized. EJGH requested that Dr. Dale forward a treatment plan. In response, Dr. Dale submitted a 1010 Form seeking authorization for eight additional treatments and the EMG/NCS. On August 23, 2012, EJGH denied the eight additional chiropractic treatments pending a second medical opinion and, on August 27, 2012, approved the EMG/NCS.
On October 2, 2012, Claimant was involved in her second work-related accident when she stepped on a rug that moved, causing her to fall on her right knee which jarred her lower back. On the same day, she was seen by Dr. Rothaermel. She complained of constant back pain and intermittent knee pain. Dr. Rothaermel diagnosed Claimant with a knee contusion 'and lumbar sprain/strain. He advised her to ice the knee and take muscle relaxers for her back. He continued Claimant on regular duty.
The day after Claimant’s second accident, she was seen by Dr. Robert Steiner for a second medical opinion. Dr. Steiner noted that Claimant complained of low back pain with bilateral buttock pain and pain in her right leg "with burning, | .¡weakness and tingling. He believed her complaints were suggestive of sacroiliac dysfunction. He noted that her mild facet hypertrophy at L4 through S-l was a degenerative condition consistent with her age group. Dr. Steiner opined that Claimant suffered a lumbar strain/sacroiliac strain as a result of the December 2011 accident. He did not believe she had any lumbar nerve root impingement, irritation or neurological deficit. Dr. Steiner found no objective physical findings, but opined Claimant had not reached maximum medical improvement. He recommended physical therapy for sacroiliac mobilization and stabilization. He did not believe ongoing chiropractic care was needed because Claimant stated she had not improved with such care. Dr. Steiner further concluded an EMG/NCS was not warranted because Claimant did not have any neurological findings. Dr. Steiner did not comment on the effect or potential effect of Claimant’s second accident on her condition.
Despite Dr. Steiner’s opinion, Claimant had an EMG/NCS performed on October 9, 2012 by Dr. William Knight, upon referral by Dr. Dale. The EMG showed “[n]or-mal sensory and motor nerve conduction studies and EMG of the right lower limb and paralumbar muscle.” There was “[n]o evidence of lumbar radiculopathy, myopa-thy, entrapment, or polyneuropathy.” Thereafter, on October 10, 2012, Dr. Dale advised EJGH that.he has continued to treat Claimant despite no further authorization. He indicated that Claimant advised him the EMG/NCS showed a *682 pinched nerve in her low back. As such, on October 11, 2012, Dr. Dale filed a 1010 Form requesting eight additional chiropractic treatments for palliative care and referral of Claimant to a neurosurgeon. EGJH denied additional chiropractic treatment on the basis of the second medical opinion by Dr. Steiner that indicated such treatment was not medically necessary. There is nothing in the | «record indicating what action, if any, EJ6H took regarding Dr. Dale’s request for a neurosurgeon.
On October 18, 2012, Claimant saw Dr. Horace Mitchell, a neurosurgeon, unbeknownst to EJGH and without authorization. She reported to Dr. Mitchell that she was referred to him by her primary care physician, Dr. Christy Montegut.[4] During her visit, Claimant did not tell Dr. Mitchell about her two prior work-related accidents. Dr. Mitchell’s notes from Claimant’s first visit state that Claimant presented “for low back pain since December 2011 with no inciting event.” Claimant admitted at trial that she did not tell Dr. Mitchell that her injury resulted from a work-related accidént.
Dr. Mitchell noted that Claimant was suffering low back pain that radiated into both legs with numbness, tingling, and weakness in her right leg. He further noted that Claimant had undergone physical therapy with no relief. He diagnosed Claimant with low back pain and right leg pain and ordered a lumbar MRI.[5] Claimant had the MRI on October 24, 2012, which showed a concentric bulge at L4-5 and L5-S1. The impressions were “[m]ini-mal degenerative disc disease along with facet disease as described. No obvious soft tissue extrusions. Posterolateral protrusions to the right at L4-5 appears to minimally compromise the lateral extent of right L4 root.” Claimant returned to Dr. Mitchell after the MRI and he diagnosed her with a herniated lumbar disc with nerve impingement at the L4 root. He recommended lumbar epidural steroid injections at L4-5. One week later, on October 31, 2012, Claimant saw Dr. Tarun Jolly, a pain management specialist, who agreed Claimant , would benefit from epidural steroid injections because of her [nMRI findings, radicular complaints, physical exam, and failure to respond to physical therapy and chiropractic care. Claimant received epidural steroid injections at L4, L5 and SI, administered by Dr. Jolly, on November 14, 2012.
On December 13, 2012, Claimant suffered her third work-related accident. She testified that she was helping turn a 600 lb. patient when she felt pain down her left arm. She did not immediately report the accident because she thought the pain would go away. However, after two weeks, she still had pain and numbness down her arm and into her hand. Claimant saw Dr. Rothaermel on January 3, 2012, in connection with this third accident. She reported burning pain radiating down her arm to her hand and soreness in her left trapezius. Dr. Rothaermel diagnosed Claimant with a left shoulder sprain.
After her December 2012 accident but before being treated by Dr. Rothaermel, Claimant underwent an independent medical evaluation by Dr. Henry Eiserloh, an orthopedic surgeon, on December 21, 2012. Dr. Eiserloh noted that Claimant complained of radicular pain and back pain. *683 He found no objective evidence on her lumbar MRIs of August 2011 and January-2012 or EMG/NCS results to corroborate her radiculopathy. Dr. Eiserloh believed a myelogram and post-myelogram CT were warranted to rule out any lesion that cannot be seen on the MRI.[6] He also recommended Claimant have lumbar x-rays. He did not believe any injection or surgery was warranted at this time based on her physical exam and imaging studies. Dr. Eiserloh opined that Claimant was able to continue working.-
Claimant missed her next two appointments with Dr. Rothaermel on January 17, 2013 and February 27, 2013. However, the record shows she saw Dr. |inMontegut, her primary care physician, on March 13, 2013 with complaints of lumbár spasm. Thereafter, on March 22, 2013, Claimant returned to Dr. Rothaermel with complaints of persistent low back pain radiating into her hips, right leg weakness, and neck and left shoulder/arm pain. During that visit, Claimant requested a CT myelo-gram. Dr. Rothaermel explained to her that the test was not supported by medical advisory guidelines. He recommended a repeat of the EMG/NCS to further investigate functional nerve impingement or pathology. Claimant refused the test after explaining that she suffered post traumatic stress disorder as a result of the previous EMG/NCS. Dr. Rothaermel ordered a cervical MRI to investigate Claimant’s neck and left shoulder and arm pain, which was approved by EJGH.
On March 27, 2013, Dr. Lonseth submitted a 1010 Form requesting approval of an epidural steroid injection at L4 for Claimant, which was denied. The record does not indicate if Claimant had seen Dr. Lon-seth prior to this time and after any of the three work-related accidents.
'Claimant underwent a cervical MRI on April 5, 2013. The MRI revealed spinal stenotic changes at C2-3, C3-4, and C4-5, suggestive of cord compression and possibly related to ossification of the posterior longitudinal ligament that encroached the spinal canal. The study was also suspicious for central disc herniations at C2 through C6.
Claimant followed up with Dr. Rothaer-mel on April 9, 2013, at which time she again requested a CT myelogram. ’ Dr. Rothaermel explained that an MRI is the preferred test. He again recommended a repeated EMG/NCS, which Claimant again declined. Dr. Rothaermel recommended a consult with Dr. Lonseth for epidural steroid injections. He also discussed the results of the cervical MRI and N discharged Claimant to a neurosurgeon. EJGH authorized Claimant to see neurosurgeon Dr. Voorhies for her neck complaints only.
Claimant saw Dr. Voorhies on June 20, 2013. He noted that 'he had seen her over five years earlier, at which time he recommended cervical surgery because a “dangerous degree of spinal stenosis was present.” He also noted that Claimant’s neurological exam at the time was normal. Dr. Voorhies reviewed the April 2013 cervical MRI and found it tó be similar to the abnormalities revealed five years earlier. He found Claimant’s current physical exam to be normal, but noted she now reported left cervical radiculopathy. He *684 found no- objective evidence for hér radi-culopathy 'and recommended a cervical myelogram, CT scan and EMG. Nothing in the record shows that Claimant followed up with Dr. Voorhies after this initial visit. .
Rather, Claimant returned to Dr. Mitchell on July 18, 2013 with complaints of back and leg pain. At this visit, Dr. Mitchell also noted that Claimant had neck issues from five years earlier. - He ordered a discogram and-placed Claimant, on temporary complete disability. Claimant had a discogram on July 31, 2013, which showed a concentric bulge at L4-5. She followed up with Dr. Mitchell on August 15, 201,3, at which, time Dr. Mitchell ruled out lumbar surgery based on the disco-gram results.
During the August 15, 2013 visit with Dr. Mitchell, Claimant revealed that she had a December 2012 work-related accident and started experiencing increasing neck pain and left shoulder weakness. Dr. Mitchell reviewed Claimant’s April 2013 cervical MRI and indicated that it showed cervical kyphosis with severe central sten-osis from C2-6. He recommended cervical surgery and found Claimant was unable to work pending surgery.
|12On August 21, 2013, Claimant returned, to Dr. Lonseth with complaints of cervical pain radiating into her left upper extremity and low back pain radiating down her right leg. Dr. Lonseth noted that Dr. Voorhies had recommended neck surgery in 2009 but Claimant did not pursue surgery because her symptoms had resolved. He recommended neck surgery and noted that Claimant’s back pain was secondary to her neck complaints.
On September 19, 2013, Claimant saw her primary care doctor, Dr. Montegut, for lumbosacral disc disease. Dr. Montegut prescribed Claimant a walking cane for lumbar radiculopathy and a cervical pillow.
On - September 24, 2013, Claimant had her first visit with Dr. Cuong Bui, a neurosurgeon, on referral of Dr. Montegut for a third opinion regarding cervical surgery! He agreed with Dr. Voorhies and Dr. Mitchell that cervical surgery was warranted. On October 31, 2013, Claimant underwent an anterior C3-4 and C4-5 mi-erodiskectoniy and fusion performed by Dr. Bui.
. Thereafter, Claimant continued to see Dr. Lonseth for her low back pain. He performed epidural steroid injections in December 2013, but Claimant had. no relief. She also, saw Dr. Bui in February 2014 for her low back pain with right sided radiculopathy. Dr.. Bui recommended a lumbar MRI to rule out .lumbar disc problems and recommended anti-inflammato-ries, muscle relaxers and physical therapy.
The last medical note in the record prior to the day of trial was from Dr. Lonseth recommending a CT myelogram of Claimant’s lumbar spine.
In addition to the above medical records, Claimant, who was in proper person, testified at trial and presented the live testimony. of her husband, Donald Rixner, Jr., and her friend of 30 years, Genavieve Caston. Mr. Rixner testified that Claimant lives in constant pain since her three work-related accidents and has not | ^recovered. Ms. Caston testified that she had to help Claimant after her surgery by helping out in the home and driving Claimant’s children to and from school. Ms. Caston further testified that Claimant has not been living her normal life since her work-related accidents.
In its defense, EJGH presented the testimony of Lilli'Bear, the claims adjuster who handled Claimant’s case. She testified that the medical bills of Drs. Jolly, Mitchell, Montegut, Bui and Lonseth were not paid because there had been no re *685 quest for treatment with these doctors and Claimant failed to execute a choice of physician form for any of these doctors. The record shows that Claimant signed • a choice of physician form on March 1, 201¾ acknowledging her right to choose her own treating doctor, but choosing to continue treating with EJGH’s doctors Dr. Rothaer-mel and Dr. Lonseth. Ms. Bear also testified that the medical documentation showed that Claimant reached her baseline pre-injury level áfter all three accidents. EJGH also presented the deposition testimony of Dr. Rand Voorhies, who testified that Claimant’s cervical MRI of 2007' and 2013 were essentially unchanged.
After taking the matter under advisement, the trial court rendered judgment on December 4, 2014, finding that Claimant’s pre-existing back and cervical problems were aggravated by the three work-related accidents. The trial court awarded Claimant temporary total disability benefits from July 8, 2013 through the present, and supplemental earnings benefits, if applicable, between June 13, 2013 through July 8, 2013. The trial court also ordered EJGH to pay for all medical expenses arising from the three accidents. The trial court further determined that EJGH did not reasonably controvert Claimant’s claims and assessed penalties in the amount of $8,000.

J^ISSUES

EJGH appeals the trial court’s judgment, asserting that Claimant is not entitled to workers’ compensation benefits because she failed to show a causal connection between her current disability and any of her work-related accidents. EJGH contends that any aggravation of Claimant’s pre-existing conditions1 caused by the' work-related accidents completely resolved and any disability Claimant is experiencing is the result of her pre-exit-ing condition and not the work-related accidents.
Additionally, EJGH challenges the trial court’s award of medical benefits arising out of unauthorized medical treatment, the enforceability of the judgment due to its vagueness about which medical expenses are to be paid, and the trial court’s award of penalties based on its determination that EJGH failed to reasonably controvert Claimant’s claim.

LAW & ANALYSIS

Causation

An employee in a workers’ compensation action has the burden of establishing a causal link'between the accident and the subsequent injury or disabling condition. Peveto v. WHC Contractors, 93-1402 (La.1/14/94); 630 So.2d 689, 691. A worker’s pre-existing condition does not bar his recovery because an employer takes his employee as he finds him. Bailey v. Jefferson Parish Gov’t, 13-905 (La.App. 5 Cir. 5/14/14); 142 So.3d 95, 101, writ denied, 14-1170 (La.9/19/14); 149 So.3d 245. In Sharbono v. Fire Safety Sales & Service 04-265 (La.App. 3 Cir. 9/29/04); 883 So.2d 1066, 1070, writ denied, 04-2661 (La.1/28/05); 893 So.2d 73, the Third Circuit explained that “[a]n abnormally susceptible worker is entitled to no less protection under the workers’ compensation statute than a healthy worker,” and “[i]t is immaterial that the | ^diseased or weakened condition of the worker might eventually produce the disability suffered outside the employment situation.”
A claimant with a pre-existing disease or infirmity bears the burden of proving that the accident “aggravated, accelerated, or combined with the disease or infirmity to produce death or disability for which compensation is claimed.” Peveto, supra. The element of causation is satis- *686 fíed if the employee’s work-related accident was a factor in bringing about the employee’s disabled status. Bailey, 142 So.3d at 102, citing Tate v. Cabot Corp., 01-1652 (La.App. 3 Cir. 7/3/02); 824 So.2d 456, 461, writ denied, 02-2150 (La.11/22/02); 829 So.2d 1044.
The work-related accident is presumed to have aggravated, accelerated or combined with an employee’s pre-existing disease to produce his disability if (1) he had not manifested disabling symptoms before the accident; and (2) there is medical or circumstantial evidence indicating a reasonable possibility of a causal connection between the accident and activation of the disabling condition. Peveto, 630 So.2d at 691. Once an employee establishes the presumption of causation, the employer must produce evidence to show that it is more probable than not that the work accident did not aggravate, accelerate or combine with the pre-existing disease or infirmity to produce his disability. Id. While medical testimony is significant, it is not conclusive as to the issue of causation which is to be decided by weighing the totality of the evidence. Id.
The trial court’s finding that the work-related accident caused an aggravation of the claimant’s pre-existing condition is factual and, thus, is subject to the manifest error standard of review. Banks v. Jefferson Parish School Bd., 95-779 (La.App. 5 Cir. 2/14/96); 670 So.2d 1284, 1287. Accordingly, an appellate court may not set aside the trial court’s findings unless they are clearly wrong in light of the record viewed in its entirety. Dean v. South-Mark Constr., 03-1051 (La.7/6/04); 879 So.2d 112, 117. An appellate court may not reverse the findings of the lower court even when convinced that it would have weighed the evidence differently if it had been sitting as the trier of fact. Id.
It is undisputed that Claimant suffered with a pre-existing cervical condition and lumbar pain. The presumption of causation may attach to a claimant who exhibited symptoms of his allegedly disabling illness in the distant past provided that he had suffered no such symptoms immediately prior to his workplace accident. Bailey, 142 So.3d at 102. Although Claimant manifested cervical and lumbar symptoms prior to the first work-related accident, they were neither immediate nor disabling. Claimant sought treatment for lumbar pain four months prior to her first work-related accident, which was not immediately prior to her accident. Additionally, despite her cervical diagnosis in 2007 and sporadic lumbar pain, Claimant continued to work for years with these preexisting problems. Shortly after the first work-related accident, Claimant began experiencing radiating pain into her right leg and right leg weakness. After her third work-related accident, Claimant began experiencing radiating pain into her left arm and hand. It was the aggravation of Claimant’s cervical condition that led to her current disability. There is no indication in the record that Claimant had experienced these radicular symptoms prior to the accident. Aggravation of a pre-exist-ing injury or condition may constitute a disabling injury when the claimant begins to suffer new symptoms after the accident. Hotard v. Murphy, Rogers, Sloss & Gambel, 11-1143 (La.App. 5 Cir. 5/31/12); 97 So.3d 407, 412.
The medical records and circumstantial evidence sufficiently demonstrated a reasonable possibility of a causal connection between the workplace accidents and the activation of Claimant’s disabling condition; thus, the presumption of causation attached and it was incumbent upon E JGH to present evidence to rebut the | ^presumption. In an effort to rebut the presumption of causation, EJGH relied on *687 Dr. Voorhies’ opinion that Claimant’s recent April 2013 cervical MRI showed the same abnormalities he found in 2007. As such, EJGH argued Claimant did not suffer an aggravation of her pre-existing cervical injury.
In stating that Claimant’s 2013 MRI appeared similar to the abnormalities revealed on his diagnostic work up from 2007, Dr. Voorhies explained that a direct comparison of an MRI to a CT scan is “always difficult” and “not precisely possible.” Additionally, in 2007, Dr. Voorhies found that Claimant “was at high risk for a sudden catastrophic and irreversible sudden deterioration if she was involved in any injury no matter how slight.” Claimant was involved in three work-related accidents, the last of which aggravated her neck condition. Further, Dr. Voorhies noted in his 2013 examination of Claimant that the one difference from his 2007 examination was her complaint of cervical radiculopathy, and he recommended a cervical myelogram. Claimant’s condition continued to deteriorate after the December 2012 accident, and she underwent cervical surgery in October 2013. Contrary to EJGH’s argument, we do not find Dr. Voorhies’ testimony rebutted the presumption of causation.
Regarding Claimant’s lumbar complaints, EGJH relies on the second medical opinion of Dr. Steiner and the independent medical examination of Dr. Eiserloh in which both doctors opined that Claimant reached her baseline pre-existing lumbar condition in May 2012. Their opinions were based on their conclusions that there was no change between Claimant’s August 2011 and January 2012 lumbar MRIs.
Dr. Steiner examined Claimant once on October 3, 2012, one day after her second work-related accident wherein she again injured her lower back. Dr. Eiserloh examined Claimant once on December 21, 2012, and found no objective | isevidence to corroborate Claimant’s complaints of radi-culopathy. However, he noted that she deserved a myelogram to rule out any lesion that could not be seen on the MRI. Dr. Eiserloh prepared an addendum report on May 9, 2013, after Claimant’s third accident, indicating that he had reviewed Claimant’s third lumbar MRI dated October 2012, and again found no change from Claimant’s two previous MRIs. This time he opined that based on Claimant’s third lumbar MRI, there was no need for a myelogram and that he still believed Claimant was at her baseline.
Although none of Claimant’s treating physicians opined whether Claimant had returned to her pre-existing baseline at any point since the work-related accidents, we find the trial court could have reasonably rejected the testimony of Drs. Steiner and Eiserloh in favor of the extensive medical records that showed Claimant’s lumbar radicular complaints started after her work-related accidents and had not resolved at the time of trial. Claimant’s medical records show that she consistently complained of lumbar radiculopathy after the accidents through the date of trial, and that she did not have such extensive radi-cular symptoms prior to the work-related accidents.
Based on this evidence, we cannot find the trial court was manifestly erroneous in determining that Claimant’s work-related accident aggravated and combined with her pre-existing condition to result in her current disability.

Award of Medical Benefits

EJGH argues that the trial court erred in awarding medical benefits for Claimant’s unauthorized treatments. EJGH contends Claimant failed to properly request treatment, failed to provide a choice of doctor form for each specialty, and saw multiple doctors in the same spe *688 cialty without their knowledge. EJGH further |19asserts the judgment is unenforceable because it is. unclear which medical expenses are to be paid.
We agree the judgment regarding what medical expenses are to be paid is indeterminate. In its judgment, the trial court ordered that “the defendants shall pay for all medical expenses, medication expenses, arid transportation expenses, arising from the accidents on December 7, 2011, October 2, 2012, and December 13, 2012.'’ The judgment does not specify" a dollar amount that EJGH is to pay Claimant for medical expenses.
While the parties stipulated that certain doctors’ medical bills were not paid by EJGH, the parties did not stipulate as to the amount incurred. The record shows that some of the medical treatment by Dr. Montegut was clearly unrelated to the work-related accidents.[7] Additionally, Claimant -executed a choice of physician form selecting ' Dr. Rothaermel and Dr. Lonseth as her doctors. However, despite initial approval to treat with Dr. Lonseth in February 2012, she did not. Claimant instead saw Dr. Jolly for her pain management treatment in October 2012. She later started treating with Dr. Lonseth in 2013, but it is unclear from the record whether authorization from EJGH had been sought at this time. Further, the record shows that while Claimant was actively treating with Dr. Rothaermel and EJGH was approving various medical treatment, Claimant started treating with Dr. Mitchell without requesting authorization from EJGH and without advising Dr. Mitchell about any of her work-related accidents. Thereafter, EJGH approved Claimant’s treatment with Dr. Voorhies, a neurosurgeon. Claimant saw Dr. Voorhies once and then started- treating ‘ with Dr. Bui, another neurosurgeon, again without requesting authorization from EJGH and without advising Dr. Bui of her work-related accidents.
| ^Accordingly, we find it necessary to remand this case for a determination of the exact -dollar amount of medical expenses incurred as a result of Claimant’s work-related accidents that are owed' by EJGH to Claimant. See Summers v. Ritz-Carlton New Orleans, 14-800 (La.App. 5 Cir. 5/28/15), 171 So.3d 329, 346-347; Stewart v. Livingston Parish School Bd., 07-1881 (La.App. 1 Cir. 5/2/08); 991 So.2d 469, 477. On remand, the trial court is- cautioned to consider the applicability of La. R.S. 23:1121 and 23:1142.

Penalties

Lastly, EJGH asserts the ..trial court erred in assessing penalties. It contends that it approved various medical treatment relating to the three work-related accidents and had objective evidence to discontinue treatment.
When an employer fails to pay workers’ compensation benefits, penalties may be assessed if the employer did not reasonably controvert the claim. La. R.S. 23:1201. A claim is reasonably controverted when the employer has sufficient factual and/or medical information to reasonably counter evidence presented by the claimant. Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98); 721 So.2d 885, 890. Whether an employer has failed to reasonably controvert a claim is a question of fact and is subject to the manifest error standard of review. Hayward v. Boh Bros. Constr. Co., LLC, 14-860, *13 (La.App. 5 Cir. 3/25/15); 169 So.3d 622. An employer should not be liable for penalties *689 for taking a close factual or legal question to court for resolution. Young v. City of Gonzales, 14-1299 (La.App. 1 Cir. 3/12/15); 166 So.3d 1070, 1077. While the Louisiana Workers’ Compensation Act is to be liberally construed in regard to benefits, penal statutes are to be strictly construed. Id.
Upon our thorough review of the record, we find that the trial court was manifestly erroneous in its finding that EJGH had not reasonably controverted |⅞1 Claimant’s claim for benefits. EJGH approved various medical treatment relating to the three work-related accidents. It based its decision to stop medical benefits for Claimant’s lumbar injury relating to Claimant’s first and second accidents after Dr. Steiner and Dr. Eiserloh opined that Claimant had reached her baseline preexisting lumbar condition in May 2013. EJGH continued to authorize medical treatment for the cervical injury Claimant sustained in December 2012 until Dr. Voorhies found Claimant was essentially the same in June 2013 as she was when he treated her in 2007, before any of the work-related accidents.
The record shows that Claimant was less- than candid in her dealings with her doctors and EJGH. While treating with doctors known and approved by EJGH, Claimant was also seeing other doctors without the knowledge or approval of EJGH. Additionally, in treating with these other doctors, Claimant did not disclose her work-related accidents. As such, the medical records of these doctors indicate Claimant had an onset of symptoms without an inciting event. Thus, EGJH had reasonable grounds to question the extent the accidents'aggravated Claimant’s pre-existing conditions.
Based on the factual and medical information EJGH possessed, EJGH had artic-ulable and objective reason to deny benefits. Accordingly, we conclude the trial court erred in imposing -penalties against EJGH pursuant to La. R.S. 23:1201(F), and we reverse that portion of the judgment.

DECREE

For the foregoing réasons, we affirm that portion of the trial court’s judgment finding Claimant’s - work-related accidents aggravated her pre-existing [¡^conditions and resulted in her current disability; reverse that portion of the judgment assessing penalties in the amount of $8,000; and remand the matter for a specific determination of the amount of medical benefits owed by EJGH.

AFFIRMED IN PART; REVERSED IN PART; REMANDED

. The appellate record only contains the first of the three disputed claim for compensation forms, which was filed on October 5, 2012.

. A September 2007 cervical CT scan showed Claimant had a “[c]ongenitally small spinal canal with multiple disc herniations and spinal stenosis.”

. At this point, Claimant had attended 11 physical therapy sessions.

. We note that the medical records show that Claimant had only seen Dr. Montegut on two occasions prior to Dr. Mitchell’s visit and after the December 2011 work-related accident, and both visits were for chest congestion and cough — not low back pain.

. There is no indication if Dr. Mitchell was aware of Claimant's previous lumbar MRIs of August 2011 and January 2012.

. At the time Dr. Eiserloh saw Claimant, he was not aware of Claimant’s October 2012 lumbar MRI ordered by Dr. Mitchell. However, on May 9, 2013, Dr. Eiserloh provided an addendum to his' report referencing the October 2012 MRI. He opined that there was no difference between the three MRIs and did not find the October 2012 MRI showed a herniation, but rather it simply showed facet arthropathy at L4-5 and L5-S1. He further opined that as a result of the most recent MRI, a myelogram and post-myelogram CT were not necessary.

. The medical records show Claimant saw Dr. ' Montegut at least twice'in 2012 and twice in 2013 for cough and congestion. Additionally, in 2013, Claimant saw Dr. Montegut on at least two occasions for sleep apnea.